No. 69,354

IN THE MATTER OF THE ADOPTION OF J.H.G., a minor child.

(869 P.2d 640)

Opinion filed
March 4, 1994.

*Sharon Wright Kellstrom*, of Clark & Kellstrom, Chtd., of Manhattan, argued the cause and was on the briefs for appellant/natural mother.

*Charles D. Green*, of Arthur, Green, Arthur, Conderman & Stutzman, of Manhattan, argued the cause, and *Derrick L. Roberson*, of the same firm, was with him on the brief for appellees/adoptive parents.

The opinion of the court was delivered by

ABBOTT, J.: The natural mother of J.H.G., a minor child, appeals the trial court's denial of her motion to set aside a decree of adoption filed on March 4, 1992. The appeal was transferred to this court pursuant to K.S.A. 20-3018(c).

The facts are largely undisputed. The natural mother, E.G., now 24, was born and raised in Ethiopia. After she was graduated from high school she moved to Manhattan, Kansas, in 1988 to

attend Kansas State University. She has completed several semesters at Manhattan Christian College and at Kansas State University, where she is studying computer science. During high school in Ethiopia she studied English and, after moving to Manhattan, she successfully passed an English proficiency test.

In August 1990, the natural mother was married to G.D. Shortly thereafter, her husband moved to Germany for one year on a scholarship. He returned to Manhattan in August 1991.

In July 1991, E.G. discovered she was pregnant as a result of sexual intercourse with C.D. (not her husband) in late April or early May 1991. She informed C.D. of the pregnancy and they discussed her options, including abortion and adoption. A friend who was aware of E.G.'s dilemma introduced her to the appellees herein, who expressed an interest in adopting E.G.'s child.

The adoptive parents met with the natural mother. They arranged for the natural mother to see Dr. Fischer, provided transportation, and accompanied her to several appointments throughout the pregnancy. The adoptive parents agreed that if they were allowed to adopt the child, they would pay the natural mother's medical expenses.

During one of the visits to the doctor, the adoptive mother informed the natural mother that Meryl Wilson, an attorney in Manhattan, would be handling the adoption. The adoptive mother offered to hire an attorney for the natural mother if she desired.

On January 24, 1992, the natural mother went into labor and arrived at the hospital in the early morning hours. At approximately 6:00 a.m., her husband informed the adoptive parents that his wife was in labor, and the adoptive parents went to the hospital.

The child was born at 11:04 a.m. Dr. Fischer testified that various drugs were given during labor, but he opined that the drugs would have dissipated by 10:00 a.m. Dr. Fischer noted that a labor period from 12:00 a.m. to 11:04 a.m. would be "very average." Dr. Fischer also noted that there was no mental or cognitive impairment due to either the drugs administered or the natural mother's fatigue.

The baby was placed with the natural mother in the delivery room from 11:40 a.m. to 1:00 p.m., when the baby was taken to the nursery. At 12:15 p.m. the natural mother went to the

bathroom and reported no dizziness. She was served lunch. She was moved to a private room where she and her husband fell asleep. She awakened at approximately 2:15 p.m. when the adoptive parents came into the room and informed her that the attorney was there.

Meryl Wilson entered the room after the adoptive parents left and introduced himself. Nancy Knopp, a social worker for the hospital and the wife of Wilson's law partner, was with him. Wilson handed the natural mother two documents, a "Consent of Natural Mother" and a "Statutory Consent to Adoption, Consent to Adoption of Minor Child, Notice to Parent." Wilson read aloud the first paragraph of the "Statutory Consent to Adoption," which states: "This is an important legal document and by signing it, you are permanently giving up all custody and other parental rights to the child named herein, so as to permit the child's adoption. You are to receive a copy of this document." The natural mother, by her testimony, spent 10 or 15 minutes reading the documents. She questioned Wilson as to why there was nothing about visitation in the documents. The natural mother and her husband testified Wilson told her that visitation was not supposed to be addressed in the documents, but that it was an issue between her and the adoptive parents. Wilson testified he told her that by signing the documents she was giving up all parental rights, and that any agreement concerning visitation would be between her and the adoptive parents. Wilson then asked if she still wanted to sign the documents, and she did sign them. Wilson also gave the natural mother's husband a "Consent to Adoption" form, which he signed. Wilson had the natural mother's husband sign this form because of the statutory presumption that the husband is the natural father, even though Wilson knew that the natural father was someone other than the natural mother's husband.

Wilson notarized all three forms. The time the documents were signed is not noted on the forms. However, the parties agree that the documents were signed sometime before 3:00 p.m., and they were filed at 3:21 p.m. on January 24, 1992, in the Riley District Court. The signing time was approximately four hours after the birth of the child.

The natural mother had some limited contact with the adoptive parents on January 25, 1992, as she was leaving the hospital after her release. The next contact was two or three weeks later, when the natural mother called the adoptive parents regarding whether their insurance would pay for a visit to the doctor because she was experiencing bleeding.

The final adoption hearing was held on March 2, 1992, and a decree of adoption was filed on March 4, 1992. Although C.D. (the natural father) was given notice of the hearing by certified mail (for which he signed) and by newspaper notice, he did not attend the hearing.

The natural mother next spoke with the adoptive mother the day that the final decree was filed and asked if she could see the baby. A few days later, the adoptive mother took J.H.G. to the Pizza Hut where the natural mother was working, and the visit lasted approximately 30 minutes.

In May 1992, the adoptive mother was hospitalized when she underwent a hysterectomy. The natural mother and her husband visited the adoptive mother in the hospital and were given a picture of the baby.

On Father's Day weekend, the adoptive mother brought the baby to visit the natural mother and her husband, and they spent approximately 30 minutes with the baby.

The natural mother later called the adoptive mother to request that they set up a schedule of visitation. The adoptive mother declined. The natural mother testified that the adoptive mother told her she should not see the child between the ages of 2 and 18, and the natural mother responded that she would not have agreed to the adoption without the visitation. The adoptive mother then called the natural mother's husband and suggested that his wife get counseling. The natural mother called the adoptive parents the next morning and was told she could no longer see the child.

That evening, the natural mother called Nancy Knopp to see if she remembered the discussion with Wilson concerning visitation. Knopp was unable to recall the discussion.

The natural mother then engaged her present counsel who, on July 13, 1992, filed the motion to set aside the consent to the adoption, which is the subject of this appeal. C.D., at the request

of the natural mother (who chose and paid C.D.'s attorney), also filed a motion to set aside the adoption decree. C.D.'s motion was dismissed for lack of prosecution when he failed to appear for a scheduled blood test, and he has not appealed.

After hearing evidence and considering briefs filed by the parties, the trial court entered judgment in favor of the adoptive parents. In its memorandum decision, the trial court made the following findings of fact:

"[T]he natural mother herein is an Ethiopian student attending Kansas State University. She studied English for several years while growing up in her native country and from her testimony and appearance on the witness stand, the Court believes she speaks fluent English and understands the language well. Her command of the English language has allowed her to steadily progress in Computer Science, a difficult program at Kansas State University.

"During the summer of 1991, movant . . . found herself to be pregnant. Her husband, . . . now a mathematics instructor at K.S.U., was out of the country, and though he is the statutorily presumed father of the baby in this case, it is clear from the evidence that he is not the natural father because of his lack of access to movant.

"Upon learning she was pregnant, movant began to consider her options. She called an adoption agency in Kansas City and learned that she would have no rights to the child if an adoption was granted. Nonetheless, she concluded it was best to give her unborn child up for adoption at its birth. Abortion was out of the question in her mind. Toward the end of adoption, she arranged through a mutual acquaintance to meet with . . . the adoptive parents. That meeting took place on or about August 10, 1991. No agreement between movant and the [adoptive parents] was made at that time regarding either the fact of adoption or regarding visitation if an adoption should take place.

"After a few days, [the adoptive mother] and movant conferred by telephone and it was determined that the [adoptive parents] could proceed to adopt movant's baby. [The adoptive mother] offered to pay for legal counsel for movant. [The adoptive mother] also arranged to have movant seen by Rex Fischer, M.D., an obstetrician-gynecologist, for the purpose of prenatal care. [The adoptive mother] accompanied movant to see Dr. Fischer on nine separate occasions between August, 1991, and the baby's birth on January 24, 1992. The [adoptive parents] also agreed to and did pay all of movant's expenses for prenatal care and child birth.

"Dr. Fischer testified, and the Court so finds, that [the adoptive mother] was with movant at all prenatal appointments, and that there was never any discussion of adoption being contingent on visitation rights, and that from his perspective this was a normal adoption, i.e. movant knew at all times what she was doing and what she wanted to do.

"In January, 1992, just prior to the birth of the baby, movant and her husband met with the [adoptive parents] and for the first time discussed in depth the issue of visitation. No agreement was reached other than that movant agreed not to see the baby for a minimum of six months after its birth and the [adoptive parents] agreed to allow her to do so. No promises or representations were made by the [adoptive parents] as to any specific times or numbers of visitations to be exercised, nor was there any discussion that the proposed adoption was contingent upon visitation.

"Shortly after midnight on January 24, 1992, movant went into labor and presented herself at St. Mary Hospital. [The adoptive mother] arrived in the early morning hours and remained in the delivery room with movant for several hours until the birth of the baby. According to Dr. Fischer, movant's labor and birth experience were unremarkable and within normal limits. The drugs administered to movant during labor and delivery (pitocin drip, motrin, parlodel & zylocaine) were given in standard dosages. None were mood-altering, none would have had any affect [sic] on her brain function, and all would have dissipated from her system by the time she signed the adoption consent in mid-afternoon.

"Movant's baby was born at 11:04 a.m. on January 24, 1992. Movant remained in the labor room until about noon, during which time she had lunch and held the baby for a few minutes. Thereafter, she was moved to a regular room where she napped for approximately two hours.

"At around 2:30 in the afternoon, attorney Meryl Wilson, who represented the [adoptive parents], arrived at the hospital for the purpose of securing a consent to adopt from movant. Wilson knew that he was seeking a consent within 12 hours of birth, but justified his actions because he knew such a consent was only voidable, he understood the parties were in agreement, and he learned that hospital authorities wanted him to try to get a temporary custody order that afternoon, a Friday, so that the baby could be released from the hospital before the weekend was over.

"Wilson and Nancy Knopp, the hospital social worker, spent approximately 15 minutes or so with movant and her husband at sometime around 2:30 or 3:00 that afternoon. Wilson read the top portion of the prepared consent to movant and then gave her both the Statutory Consent to Adoption—Notice to Parent and a Consent to Adoption to read and, if she understood and agreed, to sign. He also gave a consent form to [movant's husband] and explained it to him. At no time did Wilson indicate he was movant's attorney. In fact, he advised her he represented the [adoptive parents]. During the time Wilson was with movant, she asked him something about visitation rights. Wilson explained to her that by signing the consent she was giving up all rights to the baby and anything to do with visitation would have to be taken up with the [adoptive parents]. [Movant's husband] had no questions about the consent he signed.

"Both Wilson and Nancy Knopp testified that in their opinion, movant was lucid, understood the consent documents, and agreed to and did voluntarily sign them.

"Thereafter Wilson left the hospital, filed a petition for adoption, and obtained an order of temporary custody in favor of the [adoptive parents]. A Decree of Adoption was entered by this court on March 2, 1992. At no time prior to the entry of the Decree did movant make any claim that her consent was not freely and voluntarily obtained."

The trial court denied the natural mother's motion to set aside the consent to adoption, finding that her consent was freely and voluntarily given despite the fact it was given less than 12 hours after the birth of the child and that deficiencies in the adoption petition did not divest the court of jurisdiction to grant the adoption because the petition substantially complied with statutory requirements.

This appeal followed.

In *In re Adoption of Baby Girl H*, 12 Kan. App. 2d 223, 739 P.2d 1 (1987), the Kansas Court of Appeals considered the voluntariness of a consent to adoption which was executed between eight minutes and one hour and eight minutes after the birth of the child. The court stated:

"The majority has considered adopting a 'bright line' rule, that a consent signed within one hour of birth is void as a matter of law. Perhaps it is better left to the legislature to adopt a specific waiting period, if one is to be provided. The legislature has seen fit to provide a waiting period before a release can be validly executed. K.S.A. 60-2801. Surely an 18-year-old unmarried mother's decision to give up a child for adoption deserves as much consideration.

"The majority has no hesitancy in stating that a consent, acknowledged before a judge of a court of record in the delivery room seconds after the umbilical cord is cut, is void. What period is a decent and medically sound interval of time after birth before a mother can execute a valid consent to an adoption will obviously vary, depending upon the individual involved, the difficulty of the birth, and the medication given. This birth is the first child of an eighteen-year-old unmarried mother. We have some hesitancy in saying it is a medical issue, because we are sure all doctors have had the experience of a patient making sense and in apparent control of his/her mental processes, only to learn later that he/she has no recollection of the conversation, who was present, etc.

"We hold that the natural mother must have the opportunity to prove that the consent is void or voidable because of her inability to understand and fully comprehend what she was doing when the consent was signed, due to medication and/or the stress and pain of having given birth to a child shortly before." 12 Kan. App. 2d at 231.

In response to *Baby Girl H*, the Kansas Legislature in 1990 enacted K.S.A. 1993 Supp. 59-2116, which provides, "A consent or relinquishment may not be given by the mother or accepted until 12 hours after the birth of a child. Any consent or relinquishment given by the mother before 12 hours after the birth of a child is voidable."

In the case at bar, it is undisputed that the natural mother signed the consent forms less than four hours after the birth of her child. The issue, however, is when must the natural mother seek to revoke her consent executed prior to expiration of the statutory 12-hour time period? The natural mother suggests that, upon her request, her consent given less than 12 hours after the birth of her child is void and that such a request may be made after the final adoption decree is issued.

The adoptive parents contend first that K.S.A. 1993 Supp. 59-2116 and K.S.A. 1993 Supp. 59-2114 must be considered *in pari materia*. K.S.A. 1993 Supp. 59-2114 states in relevant part that "[a] consent is final when executed, unless the consenting party, *prior to final decree of adoption*, alleges and proves by clear and convincing evidence that the consent was not freely and voluntarily given." (Emphasis added.) They suggest that the time frame for revoking a consent under K.S.A. 1993 Supp. 59-2114 applies to K.S.A. 1993 Supp. 59-2116 as well; therefore, because the natural mother failed to set aside her consent before the final adoption decree was issued, her attempt to do so in this action is not timely. Further, they argue that even when a consent is given before the 12-hour waiting period expires, the consent should not be set aside if the evidence shows that the consent was freely and voluntarily given.

The natural mother contends that the time period provided in K.S.A. 1993 Supp. 59-2114 for revoking a consent for the reason that it was not freely and voluntarily given does not govern voiding a consent which is given before the 12-hour waiting period expires. She also argues that she must do nothing more than seek to revoke her consent in order to have it revoked; she need not prove that the consent was involuntary. The mere fact that it was given less than 12 hours after the birth of her child is sufficient to void the consent..

The legislative history of K.S.A. 1993 Supp. 59-2116 shows that several concerns went into that statute. Originally, it was proposed to contain a 24-hour waiting period; ultimately, it only provides a 12-hour waiting period. Further, early versions of the proposed statute provided that consent given within the waiting period would be "void," but the final version enacted by the legislature provides only that consent given within the waiting period is "voidable."

Minutes of the Judicial Council Family Law Advisory Committee meeting held December 10, 1987, indicate that

"[t]here appeared to be general agreement that there should be a waiting period following the birth of a child before a valid consent can be given. It was noted that S.B. 337 contains a 24-hour waiting period.

"Concerns were expressed that a right of recision in connection with consents would threaten permanency for the child to be adopted. It appeared the committee was inclined to attempt to establish safeguards prior to the time a relinquishment or consent to adoption is given to insure it is done freely and voluntarily.

. . . .

"Ms. Achterberg made a motion, seconded by Judge Phillips, that (1) consents to adoption cannot be given until 24 hours after the child's birth, (2) there be no time period within which the consenting person has an automatic right of recision . . . . The motion carried by a vote of 5-1 with Mr. Moline opposed."

In 1989, the legislative committee voted to "change the word 'void' to 'voidable' regarding consent or relinquishment to adoption prior to the 24-hour waiting period," and to "change the mandatory time for consent from 24 to 12 hours for the birth mother and to allow the birth father to consent or relinquish anytime after birth." Minutes of the July 7, 1989, Judicial Council Family Law Advisory Committee meeting show that the committee discussed the use of the word "void" in the proposed statute:

"The committee discussed whether or not this would allow, in a situation where an adoptive parent dies intestate, a sibling to raise the voidness of an adoption where a consent was given too early. Judge Bruner suggested this may be the result under present law since consent is viewed as jurisdictional in adoption cases. Mr. Moline stated there is case law to the effect that in the absence of specific statutory language indicating something is void, the matter will be viewed as voidable and thus limit who may raise the issue and when it may be raised. Judge Mershon stated that, in any

event, most people will view it as highly advisable to comply with the 24-hour provision and he preferred the committee's original language on this subject in that it may allow the court certain flexibility if such issues should arise. A motion by Mershon, seconded by Moline, to request the Council to reconsider its action on this matter carried with none opposed."

At the October 6, 1989, meeting the Judicial Council committee voted to substitute the word "voidable" for "void." Judicial Council comments to the proposal in 1990 indicate, "The committee recognizes that the [12]-hour waiting period will not assure a free and voluntary consent in every case, however, it does add a degree of protection that is not mandated under the present statutes."

The rules of statutory construction have been frequently stated:

"The fundamental rule of statutory construction is that the purpose and intent of the legislature governs when the intent can be ascertained from the statute. 'In construing statutes, the legislative intention is to be determined from a general consideration of the entire act.' *State v. Adee*, 241 Kan. 825, 829, 740 P.2d 611 (1987). In order to construe one part of a statute, it is permissible to look at other parts of it. 'The several provisions of an act, *in pari materia*, must be construed together with a view of reconciling and bringing them into workable harmony and giving effect to the entire statute if it is reasonably possible to do so.' *Easom v. Farmers Insurance Company*, 221 Kan. 415, Syl. ¶ 3, 560 P.2d 117 (1977)." *Guardian Title Co. v. Bell*, 248 Kan. 146, 151, 805 P.2d 33 (1991).

See *City of Wichita v. 200 South Broadway*, 253 Kan. 434, Syl. ¶¶ 1, 2, 855 P.2d 956 (1993).

"The fundamental rule of statutory construction, to which all others are subordinate, is that the purpose and intent of the legislature governs when that intent can be ascertained from the statute, even though words, phrases or clauses at some place in the statute must be omitted or inserted."

"In determining legislative intent, courts are not limited to a mere consideration of the language used, but look to the historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished and the effect the statute may have under the various constructions suggested."

"In order to ascertain the legislative intent, courts are not permitted to consider only a certain isolated part or parts of an act but are required to consider and construe together all parts thereof *in pari materia*. When the interpretation of some one section of an act according to the exact and literal import of its words would contravene the manifest purpose of the legislature, the entire act should be construed according to its spirit and reason, disregarding so far as may be necessary the literal import of words or phrases

which conflict with the manifest purpose of the legislature." *Brown v. Keill,* 224 Kan. 195, Syl. ¶¶ 2-4, 580 P.2d 867 (1978).

However, "[w]hen a statute is plain and unambiguous, [the court] must give effect to the intention of the legislature as expressed rather than determine what the law should or should not be." *In re Estate of Fortney,* 5 Kan. App. 2d 14, 21, 611 P.2d 599, *rev. denied* 228 Kan. 806 (1980).

Here, the legislature was concerned that the court have jurisdiction. The legislature was aware that "[c]onsent by the natural parents to the adoption of their child, where required by statute, is regarded as an essential requisite to jurisdiction on the part of the court to render a valid decree of adoption." *In re Adoption of Trent,* 229 Kan. 224, 228, 624 P.2d 433 (1981). A void judgment has no valid force and effect and may be set aside at any time, *Barkley v. Toland,* 7 Kan. App. 2d 625, 630, 646 P.2d 1124, *rev. denied* 231 Kan. 799 (1982), while a voidable judgment is valid until it is avoided. Clearly, the legislature knew the difference between "void" and "voidable" and used the term "voidable" in K.S.A. 1993 Supp. 59-2116 with the intent that a consent given by the natural mother within 12 hours after the birth of a child is voidable and not void.

When we read the entire act and consider the reasons for applicable amendments and what the legislature was attempting to accomplish, we reach the following conclusions.

A consent given by the natural mother within 12 hours of the birth of the child is voidable by the natural mother at any time prior to the trial court entering a final decree of adoption. All that is necessary for the natural mother to avoid the consent is for her to allege and prove the consent was given within 12 hours after the birth of the child.

"The legislative intent evidenced in the law reflects a strong public policy to stabilize adoptions and prevent revocation of consent of the mother on a mere whim." *In re Adoption of Irons,* 235 Kan. 540, 547, 684 P.2d 332 (1984). That aim would not be accomplished if the natural mother could avoid her consent to the adoption after the trial court enters a final adoption decree on a showing of nothing more than the time the consent was signed.

K.S.A. 1993 Supp. 59-2114 and K.S.A. 1993 Supp. 59-2116 must be read together and harmonized. K.S.A. 1993 Supp. 59-2114 provides that a consent executed in accordance with that statute is final when executed unless the consenting party, prior to the final decree of adoption, alleges and proves by clear and convincing evidence that the consent was not freely and voluntarily given. As we view K.S.A. 1993 Supp. 59-2116, it relieves the natural mother of having to allege and prove by clear and convincing evidence that the consent given within 12 hours of birth was not freely and voluntarily given. It does not, however, relieve the natural mother of the time frame within which to seek avoidance of her consent. Thus, here, the natural mother's attempt to set aside the consent to adoption because the consent was executed less than 12 hours after the birth of the child is not timely.

Once the adoption decree is final, the natural mother's attempt to set the decree aside is governed by K.S.A. 60-260. See K.S.A. 59-2213; *In re Adoption of Hobson*, 8 Kan. App. 2d 772, 775, 667 P.2d 911 (1983). A motion to set aside an adoption decree for fraud must be filed within one year after the decree was entered. K.S.A. 59-2213; K.S.A. 60-260(b)(3); *Jones v. Jones*, 215 Kan. 102, 113-15, 523 P.2d 743, *cert. denied* 419 U.S. 1032 (1974).

The natural mother's motion to set aside the decree on grounds other than that the consent was not freely and voluntarily given and was void because it was given within 12 hours of the birth of the child is timely.

K.S.A. 60-260(b) provides:

"On motion and upon such terms as are just, the court may relieve a party or said party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence . . .; (3) fraud . . ., misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2) and (3) not more than one year after the judgment, order, or proceeding was entered or taken."

Whether the natural mother's motion is viewed as alleging fraud, misrepresentation, or other misconduct of the adverse parties, or as not being valid because she did not intend to relinquish all parental rights (she alleges she intended to retain visitation rights), her argument fails for the same reasons.

The trial court held that the natural mother failed to prove fraud or misrepresentation:

"Viewed in its best light, movant's evidence shows only that the subject of visitation was discussed by the parties and that there was no clear understanding and agreement as to what, if any, visitation would be allowed. The only thing that all parties acknowledge was that there was to be no visitation for at least six months. Yet, movant sought and was granted visitation on at least two occasions prior to six months. The Court asks the rhetorical question why, if [the adoptive mother] intended to defraud movant, did she allow any visitation at all, especially prior to the six month period? The answer seems obvious to the Court. There was no misrepresentation and there was no agreement. There was only a concern on the part of [the adoptive mother] for a young woman for whom she had developed fond feelings."

The natural mother had the burden of proof, and the trial court found against her. The record contains substantial competent evidence to support the trial court's finding. Although the evidence does show that the natural mother was concerned about maintaining contact with her child after adoption and that she expected to maintain a regular visitation schedule after six months, it is undisputed there was no formal agreement as to visitation. Clearly the parties had different interpretations about what "no visitation before six months" meant as to the extent of visitation after six months.

In addition, many of the natural mother's issues and arguments fall under the category of voluntariness of her consent, an issue which is time barred by K.S.A. 1993 Supp. 59-2114.

A petition for adoption must include certain information. Among the required information for an independent adoption is:

"(A) The name, residence and address of the petitioner;

"(B) the name of the child, the date, time and place of the child's birth, and the place at which the child resides;

"(C) the suitability of the petitioner to assume the relationship;

"(D) whether one or both parents are living and the name, date of birth, residence and address of those living, so far as known to the petitioner;

"(E) the facts relied upon as eliminating the necessity for the consent, if the consent of either or both parents is not obtained;

"(F) the information required by the uniform child custody jurisdiction act under K.S.A. 38-1309 and amendments thereto; and

"(G) whether the interstate compact on placement of children, K.S.A. 38-1201 *et seq.*, and amendments thereto, and the Indian child welfare act, 25 U.S.C. 1901 *et seq.*, are applicable and have been or will be complied with prior to the hearing." K.S.A. 1993 Supp. 59-2128(a)(1).

Further,

"The written consents to adoption required by K.S.A. 59-2129, and amendments thereto, the background information required by K.S.A. 59-2130, the accounting required by K.S.A. 59-2121 and any affidavit required by K.S.A. 59-2126 shall be filed with the petition for adoption." K.S.A. 1993 Supp. 59-2128(b).

The background information required by K.S.A. 1993 Supp. 59-2130 includes:

"(1) [a] complete written genetic, medical and social history of the child and the parents; (2) the names, dates of birth, addresses, telephone numbers, and social security numbers of each of the child's parents, if known; (3) any hospital records pertaining to the child or a properly executed authorization for release of those records; and (4) the child's birth verification, which shall include the date, time and place of birth and the name of the attending physician."

The accounting required by K.S.A. 1993 Supp. 59-2121(b) consists of "a detailed accounting of all consideration given, or to be given, and all disbursements made, or to be made, in connection with the adoption and the placement for adoption." The affidavit required by K.S.A. 1993 Supp. 59-2126 applies only if the venue of the adoption proceeding is in the county in which the child to be adopted resides.

The natural mother maintains that much of the information required to be included with the petition for adoption was not included; therefore, the court issuing the decree of adoption lacked jurisdiction to do so. The petition for adoption was deficient in several aspects and the trial court acknowledged this. The question, however, is whether these deficiencies did deprive the court of jurisdiction to issue the adoption decree.

The petition for adoption did not state the time of the child's birth. However, the statutory consent to adoption signed by the

natural mother and filed contemporaneously with the petition for adoption did state the time of the child's birth.

The petition for adoption did not state the dates of birth of the child's parents. However, the natural mother's date of birth was noted on the statutory consent to adoption signed by her and filed contemporaneously with the petition for adoption.

The petition for adoption did not specify the facts relied upon as eliminating the necessity for the natural father's consent since his consent was not obtained. However, the consent of the natural mother's husband as the putative father was obtained and filed contemporaneously with the petition for adoption. Further, the petition for adoption did state that the whereabouts of the natural father were unknown.

The petition did not include the information required by the Uniform Child Custody Jurisdiction Act (UCCJA), such as "the child's present address, the places where the child has lived within the past five years, and the names and present addresses of the persons with whom the child has lived during that period" or whether the petitioners had participated in any other litigation concerning the custody of the child or whether the petitioners had information of any pending custody proceeding concerning the child. K.S.A. 38-1309. However, the petition did include the child's date of birth, which was the same as the date the petition was filed, and the statutory consent to adoption signed by the natural mother and filed contemporaneously with the petition for adoption included the time of birth. The UCCJA was not an issue here because the child to be adopted was a newborn and all the parties involved resided in the same Kansas county.

The petition for adoption did not include a statement concerning whether the Interstate Compact on the Placement of Children or the Indian Child Welfare Act applied. In this case neither of those did apply.

The petition for adoption did not include the background information required by K.S.A. 1993 Supp. 59-2130. However, some of that information was included in the petition itself and in the documents, including the home study, filed contemporaneously with the petition for adoption.

The accounting required by K.S.A. 1993 Supp. 59-2121 was not included with the petition for adoption. However, an ac-

counting was filed on March 4, 1992, after the final hearing on the adoption but contemporaneously with the filing of the decree of adoption.

The adoptive parents contend, and the trial court agreed, that the requirements of K.S.A. 1993 Supp. 59-2128 are only directory and not mandatory; hence, substantial compliance with the requirements is sufficient. The natural mother, on the other hand, insists that a greater degree of compliance is necessary. Both parties cite *Renz v. Drury*, 57 Kan. 84, 89 (1896), wherein this court stated, "we think it fairly settled by the authorities that in a state having a statute regulating the adoption of children the provisions thereof must be substantially followed in order to clothe the adopted child with the right of inheritance."

In *In re Adoption of Trent*, 229 Kan. 224, 624 P.2d 433 (1981), this court discussed the requirements of K.S.A. 59-2102 (now K.S.A. 1993 Supp. 59-2114, K.S.A. 1993 Supp. 59-2115, and K.S.A. 1993 Supp. 59-2129). There, before an adoption decree was final, the natural mother sought to set aside her consent on the ground that it was not properly notarized. The consent had been signed by the natural mother and acknowledged by a notary public in Missouri; however, the acknowledgement was made by a Kansas notary public who lacked the authority to act beyond the boundaries of Kansas. This court applied the doctrine of substantial compliance. 229 Kan. at 227. We recognized our prior decisions holding that "the provisions of the adoption statutes must be strictly construed in favor of maintaining the rights of natural parents in controversies involving termination of the parent-child relation." 229 Kan. at 228. Noting that "the purpose and intent of the legislature governs when that intent can be ascertained from the statutes [and that it is proper to consider] the purpose to be accomplished, and the necessity and effect of the statute," this court held that "[t]he purpose and necessity of a written consent is to insure that the natural parent freely and voluntarily consents to the adoption." 229 Kan. at 228. This purpose was served even though the consent was acknowledged in Missouri by a Kansas notary public; therefore, the consent was freely and voluntarily given.

The doctrine of substantial compliance is applicable here as well. Although K.S.A. 1993 Supp. 59-2128 does use mandatory

language ("shall"), we are unable to find that the absence of one or more of those requirements necessarily divests a court of jurisdiction to grant a petition for adoption. In *Automatic Feeder Co. v. Tobey*, 221 Kan. 17, 21, 558 P.2d 101 (1976), this court stated:

"[A] judgment is not void merely because it is erroneous or because some irregularity inhered in its rendition. It is void only if the court that rendered it lacked jurisdiction of the subject matter or of the parties or if the court acted in a manner inconsistent with due process."

See *Producers Equip. Sales, Inc. v. Thomason*, 15 Kan. App. 2d 393, Syl. ¶ 2, 808 P.2d 881 (1991). Where a document filed contemporaneously with a petition for adoption includes the requisite information, though that information is not included in the petition for adoption itself, a party has substantially complied with the requirements of K.S.A. 1993 Supp. 59-2128. Substantial compliance with K.S.A. 1993 Supp. 59-2128 can also be found even when neither the petition for adoption nor the documents filed contemporaneously with the petition include some of the required information, if it is clear that the information lacking has no bearing on the adoption.

Here, the petition and the consents filed contemporaneously with the petition included much of the information required by K.S.A. 1993 Supp. 59-2128. Noticeably lacking, however, was information concerning the UCCJA, the Interstate Compact on the Placement of Children, and the Indian Child Welfare Act; the accounting of the expenses paid by the adopting parents; and the statement of background information concerning the genetic, medical, and social history of the child and its natural parents.

The accounting of the expenses paid by the adoptive parents was eventually filed with the court on March 4, 1992. Although this was after the final hearing, the document was filed contemporaneously with the adoption decree; thus, it was available to the trial court before the adoption decree was finalized. The purpose of requiring an accounting under K.S.A. 1993 Supp. 59-2121 in part is to insure that the adoptive parents are not improperly paying more consideration to the natural parents than is permitted by statute. Filing the accounting at the same time the adoption decree is filed appears to be substantial compliance with K.S.A. 1993 Supp. 59-2121, even though the information

was not given to the court at the time the adoption petition was filed.

Because the UCCJA, the Interstate Compact on the Placement of Children, and the Indian Child Welfare Act were not issues in this case, the absence of this information from the petition for adoption does not preclude a finding of substantial compliance here. K.S.A. 1993 Supp. 59-2128 does require that the petition for adoption state "whether" the Interstate Compact on the Placement of Children and the Indian Child Welfare Act apply, indicating that the information should be included even if those acts do not apply. However, it would seem that the purpose of this requirement is to merely insure that the trial court is informed when those acts do apply. Because the adoption proceedings were not affected by the lack of this information in the adoption petition, the petition for adoption substantially complies with the requirements of K.S.A. 1993 Supp. 59-2128.

The failure to include a statement of background information pursuant to K.S.A. 1993 Supp. 59-2130 concerning the genetic, medical, and social history of the child and its parents and the child's birth verification is troubling. The purpose or necessity of including this information in the petition for adoption is to benefit the child as it is useful in medical care and treatment. The record does show, and the trial court so found, that some of this information was contained in the home study filed contemporaneously with the adoption petition on January 24, 1992. However, it appears that the background information was obtained from the adoptive parents and no background information was obtained directly from the natural mother or natural father. Despite this, the trial judge found substantial compliance, and the record contains substantial competent evidence to support that finding.

The petition for adoption also failed to state "the facts relied upon as eliminating the necessity for the consent" of the natural father of the child. K.S.A. 1993 Supp. 59-2128(a)(1)(E). K.S.A. 1993 Supp. 59-2136 provides that where a father's consent has not been obtained, if a mother consents to the adoption of her child,

"a petition shall be filed in the district court to terminate the parental rights of the father, unless the father's relationship to the child has been previously terminated or determined not to exist by a court. The petition may be filed

by the mother [or] the petitioner for adoption . . . . Where appropriate, the request to terminate parental rights may be contained in a petition for adoption."

The petition for adoption made no request to terminate the parental rights of the natural father, even though his parental rights had not previously been terminated.

The natural mother contends that the failure to terminate the natural father's parental rights pursuant to K.S.A. 1993 Supp. 59-2136 renders the adoption decree void. The trial court found that the natural mother lacked standing to challenge the adoption on these grounds.

In *Trent*, 229 Kan. at 231-32, the natural mother sought to challenge the validity of a written consent signed by the natural father before the child's birth. This court noted that the adoption consent statute "does not state that either natural parent may attempt to revoke a consent freely and voluntarily given by the other parent." Because a consent to adoption given by one parent was not binding on the other parent, this court stated, "We can find no basis upon which the natural mother can challenge a separate legal instrument executed by the natural father." 229 Kan. at 232.

Whether or not the natural father's parental rights were terminated has no bearing on the consent the natural mother executed. We do note the natural father attempted to set aside the adoption decree on grounds that the procedure was flawed as to him. However, this motion was dismissed for failure to prosecute and for failure to comply with blood testing. The natural father has not appealed the dismissal. The natural mother does not have standing to assert the natural father's rights.

K.S.A. 1993 Supp. 59-2133(b) provides that in an independent adoption, "notice of the hearing on the petition shall be given to the parents or presumed parents." The parties here agree that under K.S.A. 1993 Supp. 59-2208 a parent may waive notice.

The consent of the natural mother contained the following provision:

"Further, I freely and voluntarily waive all notices of proceedings for the adoption of said minor child and enter my appearance in any proceeding instituted in the district court of Kansas for the purpose of adoption of the

minor child by [the adoptive parents], husband and wife, and consent to such proceedings and to a decree of adoption being entered."

The natural mother contends that this waiver is ineffective for two reasons. First, she believed that there would only be a hearing on the same day she signed the consent and was unaware that there would be a final hearing at a later date. Second, she signed the consent less than 12 hours after the birth of her child. Therefore, she contends, the same protection given a parent prohibiting the giving of a consent to adoption less than 12 hours after birth should apply to prohibit the signing of a waiver of notice less than 12 hours after birth.

The protection of K.S.A. 1993 Supp. 59-2116 prohibiting the giving of a consent less than 12 hours after birth of the child does not apply to the signing of a waiver of notice. K.S.A. 1993 Supp. 59-2208 only requires that waiver be made by a competent person. The trial court found that the natural mother, who had given birth approximately four hours before signing the waiver, was not incompetent to make an effective waiver, and she signed the waiver freely and voluntarily.

The next question is whether the natural mother knew what right she was waiving. The consent waives "all notices of proceedings." By signing the consent, she was agreeing to waive any and all notice of any proceeding concerning the adoption. She read this provision before she signed it. By making provision to waive any and all notice of adoption proceedings, the consent form notified the natural mother that there would be further proceedings concerning the adoption. The fact that she did not know the time frame in which the hearings or proceedings would be had does not negate her effective waiver of notice.

The trial judge did not err in refusing to set aside the decree.

Affirmed.