No. 70,968

IN THE MATTER OF THE MARRIAGE OF CRAIG W. LARSON, *Appellant*, and MARLA J. LARSON, *Appellee*.
(894 P.2d 809)

Opinion filed April 21, 1995.

*Charles A. Peckham,* of Browne, Creighton & Peckham, of Atwood, argued the cause and was on the briefs for appellant.

*Allen Shelton*, of Clark, Shelton & Pratt, P.A., of Oberlin, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This is a first impression case requiring us to construe K.S.A. 60-260(b). The specific question is whether a motion to modify a divorce decree was untimely because the motion was not filed within a "reasonable time," although it was filed within one year of the decree. The parties' written property settlement agreement was incorporated into the decree. The trial court denied the motion to modify. In a 2-1 decision, the Court of Appeals affirmed. 19 Kan. App. 2d 986, 880 P. 2d 1279 (1994). We granted the ex-husband's petition for review. We agree with the Court of Appeals' interpretation of K.S.A. 60-260(b). A motion to modify under K.S.A. 60-260(b)(1), (2), and (3) must be filed within a reasonable time and not more than one year after the judgment, order, or proceeding sought to be modified was entered. We find no abuse of discretion and affirm.

## Facts

Craig and Marla Larson were divorced on January 9, 1992. The divorce decree incorporated their "Property Settlement Agreement" (Agreement), which determined rights of maintenance (alimony), child support, and custody of their four children, in addition to dividing their property. Under the agreement, Craig agreed to pay Marla $1,900 per month until June 2006 for maintenance, child support, and property settlement, besides periodic lump sum payments. (The total of all payments would be about $370,000 over 15 years.)

Under the Agreement, Craig retained the one-half ownership interest in a cattle feedlot, Yuma Performance Feeders, Inc. (YPF), that he and Marla had owned jointly. Craig's parents owned the other half.

The record does not provide a clear picture of Craig's financial position at the time the Agreement was reached. Craig himself seemed to lack a firm understanding of his own net worth, mainly because of the uncertain financial status of YPF.

Craig was represented by the same attorney when he signed the Agreement in January 1992 and when he filed the motion to modify one year later. By the time the hearing on the modification motion was held in November 1993, Craig had changed to his current counsel, who also represented his parents.

At the hearing on the motion to modify, Craig testified that he signed the Agreement with Marla in January 1992 based on his belief that the feedlot was making a "good profit." Craig introduced into evidence two different profit and loss statements for YPF showing figures through November 1991. One showed that YPF netted $9,499.98 in November and $5,540.17 in October. The other purports to show YPF's monthly profit and loss totals for 1991, excluding December. When read together, the exhibits suggest that YPF's monthly profits exceeded $8,000, on average, and that YPF was on track in 1991 for yearly profits of about $100,000. Craig said he relied on these profit numbers in deciding to sign the January 1992 Agreement.

Shortly after Craig and Marla reached their Agreement, an accountant reviewing YPF's books found that the feedlot's financial condition was considerably different. Lance Bohall, CPA, informed Craig and his parents in a March 9, 1992, letter that he had discovered $254,625.96 in unrecorded accounts payable. Bohall cited "poor controls and/or bad judgment coupled with unusual deals made by the manager," as the reasons for the unrecorded expenses. On March 21, 1992, Bohall completed his report on YPF's finances for the year ending December 31, 1991. The 1991 year-end report showed a net loss of $187,965. By comparison, a year-end report for 1990 showed YPF with a net profit of $55,999.

Thus, by March 1992, Craig had specific information showing that YPF was in trouble and that his anticipated income from YPF profits would not be even close to what he had projected. Furthermore, YPF was heavily in debt, and its revised financial picture made obtaining credit difficult as existing creditors tightened the reins. Craig's parents had to inject $200,000 cash into the business to satisfy creditors and prevent foreclosure. By May 1992, according to Craig's testimony, the manager blamed for

much of the trouble was gone; Craig was managing the feedlot himself; he had laid off some help; and he was working 18-hour days trying to keep the business running.

Meanwhile, Craig had fallen behind in his payments to Marla almost immediately after the Agreement was filed. Within a year, Craig was $17,000 in arrears. Craig's only source of income was a $2,000 per month salary from YPF. The record shows that Marla's attorney filed motions in February, March, and December of 1992 to show cause why Craig should not be punished for contempt. A hearing was held on the motions on January 4, 1993, and the trial court ordered Craig to pay at least $900 of his $2,000 per month salary to Marla to avoid being found in contempt.

Craig filed his motion to modify the divorce decree under K.S.A. 60-260(b) on January 8, 1993.

The trial court, after hearing all the evidence, including testimony from Craig, his accountant, Craig's mother, Marla, and a bank executive, denied modification of the property settlement and maintenance provisions in the Agreement. It granted modification of child support.

The trial court reasoned: (1) YPF was under the exclusive control of Craig and his parents during 1991 when the heavy losses incurred at the hands of manager, (2) the motion was not made within a reasonable time in that Craig knew of YPF's substantial losses in March 1992 and waited nine months to file a motion for modification, and (3) "there is no way to put the parties back into a position where they were on January 9th of 1992, and the condition has deteriorated further since that date."

### The Court of Appeals' Opinion

The Court of Appeals recognized the first impression issue of whether the "reasonable time" requirement in K.S.A. 60-260(b) is separate and distinct from the one-year limitation for filing such motions with respect to statutory grounds (1), (2), and (3). Siding with many federal courts and commentators interpreting Rule 60(b) of the Federal Rules of Civil Procedure, which is identical to K.S.A. 60-260(b), the Court of Appeals held that "as to motions filed under 60-260(b)(1), (2), and (3), the one-year period rep-

resents an extreme limit and the motion may be rejected as untimely if not made within a 'reasonable time' even though it was filed within one year of the date the decree sought to be modified was entered or taken." 19 Kan. App. 2d at 992.

The Court of Appeals then considered whether the trial court abused its discretion in concluding that the motion to modify was not filed within a "reasonable time." The court found that "strong arguments can be made for both parties," but upheld the trial court's decision. 19 Kan. App. 2d at 998.

The majority emphasized that: (1) Craig carried the burden of showing abuse of discretion; (2) Craig had not proffered a valid justification for delaying his motion for nine months after learning of the feedlot's true problems in March 1992; (3) either party would be prejudiced "rather equally" by an adverse ruling on the motion for modification; (4) Craig's predicament was largely one of his own making because he signed the January 1992 Agreement despite knowledge of possible problems in the feedlot's finances; and (5) restoring the status quo as of January 1992 is impossible at this point. 19 Kan. App. 2d at 996-98.

The Court of Appeals majority emphasized that deference must be given to the trial court in this kind of determination. The majority conceded that "strong arguments can be made for both parties," and said that under such circumstances, the "superior position of the trial court" takes on even greater meaning. It lamented that it could "gaze only at a cold, printed record, which does not give us the undefinable 'feel' which a trial court has in resolving matters of this nature." 19 Kan. App. 2d at 998.

### Interpretation of K.S.A. 60-260(b)

Craig first seeks review of the Court of Appeals' interpretation of the time limitation applicable to motions for relief under 60-260(b)(1), (2), and (3). The pertinent statutory text provides:

"On motion and upon such terms as are just, the court may relieve a party . . . from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under K.S.A. 60-259(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of

an adverse party; . . . or (6) for any other reason justifying relief from the operation of the judgment. *The motion shall be made within a reasonable time, and for reasons (1), (2) and (3) not more than one year after the judgment, order, or proceeding was entered or taken.*" K.S.A. 60-260(b) (Emphasis added).

Our standard of review is unlimited. Interpretation of a statute is a question of law. *Todd v. Kelly*, 251 Kan. 512, 515, 837 P.2d 381 (1992).

Craig brought his motion to modify under 60-260(b)(1) and (2), alleging a mistake and newly discovered evidence with respect to the true value and income potential of his ownership in YPF. He filed his motion on January 8, 1993, within one year after entry of the divorce decree on January 9, 1992. Nevertheless, the trial court and Court of Appeals held that his motion could be deemed untimely as not brought within a "reasonable time." 19 Kan. App. 2d at 992.

In his petition for review, Craig cites several Kansas cases to support his position that meeting the one-year deadline is sufficient for motions under 60-260(b)(1), (2), and (3). Craig relies on *In re Adoption of J.H.G.*, 254 Kan. 780, 869 P.2d 640 (1993); *Jones v. Jones*, 215 Kan. 102, 523 P.2d 743, *cert. denied* 419 U.S. 1032 (1974); *Cool v. Cool*, 203 Kan. 749, 457 P.2d 60 (1969); *In re Thomas*, 16 Kan. App. 2d 518, 825 P.2d 1163, *rev. denied* 250 Kan. 805 (1992); and *In re Marriage of Hunt*, 10 Kan. App. 2d 254, 697 P.2d 80 (1985). None of those cases raised the issue of "reasonableness" presented in the case at bar. The precise question now before us is whether a motion under 60-260(b)(1), (2), or (3) can be denied as untimely even if filed within one year. *J.H.G., Jones, Cool, Thomas*, and *Hunt* referenced the one-year limitation; however, unreasonable delay was not a contention. A motion under 60-260(b)(1), (2), or (3), must be filed within a reasonable time, not to exceed one year, after the decree was entered. Any interpretation of language in previous cases to the contrary is disapproved.

In *J.H.G.*, for example, a natural mother, who initially consented to release her baby for adoption, filed a motion to set aside the adoption decree *four months* after the adoption decree became final. Because her motion was filed after the decree became

final, she was too late to invoke K.S.A. 1993 Supp. 59-2116. Her only option was to proceed under 60-260(b). We stated: "A motion to set aside an adoption decree for fraud must be filed *within one year* after the decree was entered. K.S.A. 59-2213; *K.S.A. 60-260(b)(3)*." (Emphasis added.) 254 Kan. at 792. No issue was raised in *J.H.G.* as to whether the four-month period between the filing of the adoption decree and her motion to set it aside was unreasonable. We concluded that her motion was timely under 60-260(b), but denied the motion on its merits.

We question the following language in *In re Thomas*, 16 Kan. App. 2d at 526: "In essence, if the [K.S.A. 60-260(b)(6)] motion is filed within one year of the entry of judgment, the trial court may grant relief for any of the reasons set forth in the statute." All 60-260(b) motions "shall be made within a reasonable time." The K.S.A. 60-260(b) one-year outside limitation applies only to a motion "for reasons (1), (2) and (3)."

The Court of Appeals' interpretation of 60-260(b) in the instant case is supported by the plain language of the statute. The use of a comma followed by "and" (rather than "or") suggests that the one-year limit is *in addition to*, not in place of, the "reasonable time" limitation for 60-260(b)(1), (2), and (3). See K.S.A. 60-260(b) ("within a reasonable time, **and** for reasons (1), (2) and (3)").

The analysis of the Court of Appeals is endorsed by the commentary from 3 Vernon's Kansas C. Civ. Proc. § 60-260.4, pp. 522-23 (1964). Our independent research suggests that the Court of Appeals' construction of 60-260(b) carries the unanimous support of courts and commentators interpreting the identical language in Rule 60(b) of the Federal Rules of Civil Procedure. See, *e.g., White v. American Airlines, Inc.*, 915 F.2d 1414, 1425 (10th Cir. 1990); *Kagan v. Caterpillar Tractor Co.*, 795 F.2d 601, 606 (7th Cir. 1986); *Ashford v. Steuart*, 657 F.2d 1053, 1055 (9th Cir. 1981); *Rhodes v. Houston*, 258 F. Supp. 546, 558 (D. Neb. 1966), *aff'd* 418 F.2d 1309 (8th Cir. 1969), *cert. denied* 397 U.S. 1049 (1970); 11 Wright and Miller, Federal Practice and Procedure: Civil § 2866 p. 232 (1973); 7 Moore's Federal Practice ¶ 60.24[4], p. 60-209 (1993). We have repeatedly noted that federal cases

interpreting rules identical to those existing in the Kansas Code of Civil Procedure are entitled to "persuasive weight." *Snodgrass v. State Farm Mut. Auto. Ins. Co.*, 246 Kan. 371, 376, 789 P.2d 211 (1990); *Neagle v. Brooks*, 203 Kan. 323, 327, 454 P.2d 544 (1969).

Craig contends that his interpretation finds support in 1 Gard's Kansas C. Civ. Proc., 2d Annot. § 60-260(b), p. 350 (1979), which says the following:

"The provision is a considerable departure from the former practice in several respects: (1) reducing the period of limitation from two years to one for relief from fraud, and from three years to one for relief from mistakes and omission; (2) making newly discovered evidence a ground for relief within one year in lieu of extending the time for filing a motion for new trial on that ground; (3) substituting 'reasonable time' in lieu of specific time limitations for making the motion where the grounds are other than those within the one year period of limitation."

We do not draw the same conclusions from the above paragraph that Craig does. Gard's explanation of how 60-260(b) changed the prior law does not address the question presented here, which is whether a "reasonable time" may expire before one year has elapsed from the judgment from which relief is sought, where a motion is brought under 60-260(b)(1), (2), or (3).

We affirm the Court of Appeals' analysis on the statutory construction issue.

## Whether Craig Filed for Relief Within a "Reasonable Time"

We next consider the difficult question of whether Craig filed his 60-260(b) motion within a "reasonable time." The trial court ruled he did not. The standard of review is abuse of discretion. Rulings on motions under 60-260(b) rest within the sound discretion of the trial court and will not be reversed absent a showing of abuse of discretion. *In re Marriage of Zodrow*, 240 Kan. 65, Syl. ¶ 2, 727 P.2d 435 (1986). The Court of Appeals affirmed, reasoning that the trial court had not abused its discretion.

Discretion is considered to have been abused only when no reasonable person would take the view adopted by the trial court. *In re Marriage of Cray*, 254 Kan. 376, 387, 867 P.2d 291 (1994). The burden of showing abuse of discretion lies with the party

alleging abuse. *Falls v. Scott*, 249 Kan. 54, 63, 815 P.2d 1104 (1991).

The Court of Appeals has held that the "reasonable time" frame in 60-260(b) is "measured by determining when the movant came into possession of facts justifying the relief as compared to the time when he filed the motion seeking the relief." *Wilson v. Wilson*, 16 Kan. App. 2d 651, 659, 827 P.2d 788, *rev. denied* 250 Kan. 808 (1992). *Wilson* further held that what is a "reasonable time" for seeking relief from judgment depends on the facts of each case. Relevant considerations include whether the parties were prejudiced by the delay and whether good cause has been shown for failing to take action sooner. 16 Kan. App. 2d 651, Syl. ¶ 6.

In the case at bar, the Court of Appeals also looked to several federal decisions to mark the parameters of "reasonable time" within the one-year outer time limit under 60-260(b)(1), (2), and (3). Most of the statements quoted from federal decisions in the Court of Appeals' opinion essentially mirror what was said in *Wilson*. One factor that was not stated in *Wilson*, which the Court of Appeals expressly approved in the instant case, is the following: " '[A]s the delay in making the motion approaches one year there should be corresponding increase in the burden that must be carried to show that the delay was " 'reasonable.' " ' " 19 Kan. App. 2d at 996 (quoting *Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne*, 605 F.2d 648, 656 [2d Cir. 1979]). We endorse the reasoning in *Wilson* and the *Amoco* factor adopted by the Court of Appeals.

### Craig's Knowledge When He Signed the Agreement

Under a broad analysis of equities, what Craig knew about YPF's troubles *prior* to signing the Agreement is relevant. As the Court of Appeals noted, Craig knew when he signed the Agreement that YPF was being audited at the request of a major creditor. Consequently, his problems are to some extent of his own doing.

Larry Maxwell, president of Northwest Kansas Production Credit Association (NKPCA), testified that his association became

aware of "unauthorized use of some loan funds" at YPF in mid-November 1991. NKPCA sent a letter to the Larsons in November 1991 requesting CPA-prepared financial information before agreeing to continue financing.

Although there is no indication that Craig knew or should have known of the extent of YPF's problems in January 1992, his judgment in signing the divorce Agreement is subject to question because YPF was under financial review and he had "suspicions" of its well-being. He claimed in a letter to the trial judge that he was being pressured by creditors to resolve the divorce and that influenced his decision. There is no evidence in the record of any such pressure, other than his statement. We note that the agreement was signed on the day that the divorce trial was scheduled to begin. The trial judge said that he had "finally forced" the case to trial by January 9, 1992.

What is really before us, however, is a much narrower question—whether Craig's nine-month delay in seeking relief, after learning in March 1992 that YPF was deep in the red, was "unreasonable." What were the reasons for Craig's delay? Are those reasons legitimate justifications? Did the delay result in prejudice or unfair advantage to either party?

### Reasons Given for the Nine-Month Delay

Craig was asked by his counsel during the hearing: "Can you explain to the court why [the motion] wasn't filed sooner?" Craig answered:

"Well, I had written letters and letters over and over and over to people, and talked to my attorney about getting something done on this, and nothing ever, there was no acknowledgment, you know. I've written letters to Judge Worden [the trial judge] and Marla [the ex-wife] and Allen [Marla's attorney and husband], and tried to get somebody to listen to, to, you know, I've got copies of them and dates and everything, but nothing ever was happening. Plus, we were working so hard trying to keep everything from falling to pieces that—"

Craig also was asked if he knew in March or April 1992 if YPF would be able to recover any of its losses from the former manager. Craig answered that he did not, stating, "[W]e didn't know whether [the manager] had put the money in an account somewhere or if, you know, some way we could go back through the records and figure out what happened. It takes time."

Craig's reasons for the nine-month delay were: (1) he tried to act sooner but could not get his attorney or anyone else to help him; (2) he was working hard trying to keep the feedlot from going under; and (3) he was uncertain for a while whether YPF would be able to recover some of its losses suffered at the hands of the former manager.

Craig's explanation that he tried to get his attorney to act sooner has no support in the record, other than his testimony. Although he claimed to have copies of letters and dates, no such letters were introduced into evidence. The only letters in the record from Craig to anyone are two letters to the trial judge, dated January 2, 1993, and May 24, 1993. Both letters, therefore, were sent after the nine-month delay and do not further Craig's claim that he tried to act sooner.

The primary inquiry is whether nine months was a reasonable delay for filing a motion to modify after Craig learned information that drastically changed his financial outlook. If nine months does not seem reasonable, then the question is whether Craig has come forward with good reasons for the delay. He may have been working long hours trying to save the feedlot, and he may have had difficulty communicating with his chosen counsel, but those justifications do not lead us to a finding of abuse of discretion.

## Whether Craig Waived His Challenge Concerning Maintenance

The district court held that it lacked jurisdiction under Kansas law to modify the maintenance provisions because the parties did not provide for modification in the Agreement and did not subsequently consent to a modification, citing *Bair v. Bair*, 242 Kan. 629, 750 P.2d 994 (1988). See K.S.A. 60-1610(b)(3). The Court of Appeals did not review this ruling. We were informed by counsel during oral argument that the maintenance issue was not argued before the Court of Appeals. Craig briefed the issue, however. In his brief, he contended that under *In re Marriage of Hunt*, 10 Kan. App. 2d at 259, relief from maintenance provisions in a separation agreement may be granted under 60-260(b) under certain circumstances, despite *Bair* and 60-1610(b)(3).

*Bair* was not a case where relief from judgment was sought under 60-260(b). In *Bair*, modification was sought more than 10

years after the decree was entered incorporating the separation agreement. By contrast, *Hunt* and other Court of Appeals cases have held relief under 60-260(b) is available "given the proper factual setting." *Hunt*, 10 Kan. App. 2d at 258-59. For example, relief might be granted either where a separation agreement was procured by fraud or where material facts affecting whether the agreement is just and equitable were not known to the parties and the court at the time the agreement was incorporated into the divorce decree. See *Hunt*, 10 Kan. App. 2d 254; *Oehme v. Oehme*, 10 Kan. App. 2d 73, 691 P.2d 1325 (1984); *Richardson v. Richardson*, 3 Kan. App. 2d 610, 599 P.2d 320, *rev. denied* 226 Kan. 792 (1979). The district court erred in holding that it lacked jurisdiction to modify maintenance.

Nevertheless, the dispositive question remains whether Craig filed his 60-260(b) motion within a "reasonable time." If he did not, then he is not entitled to modification of either the property settlement or maintenance. We find no abuse of trial court discretion.

Affirmed.