No. 96,003

IN THE MATTER OF THE ADOPTION OF X.J.A., A MINOR CHILD
BORN 12-21-2003.

(166 P.3d 396)

Opinion filed September 7, 2007.

*J. Scott Koksal,* of Lindner & Marquez, of Garden City, argued the cause and was on the brief for appellant natural mother.

*Glenn I. Kerbs,* of Dodge City, argued the cause and was on the brief for appellees adoptive parents.

The opinion of the court was delivered by

Nuss, J.: This case primarily requires us to determine the validity of a natural mother's written consent to adoption of her newborn child. Her purported consent was later acknowledged outside her presence by a notary public. The district court held that the adoptive parents substantially complied with the requirements of the consent statute, K.S.A. 59-2114, approved the consent and adoption, and terminated the natural mother's parental rights. The Court of Appeals reversed because of the adoptive parents' failure to substantially comply with the Uniform Law on Notarial Acts, K.S.A. 53-501 *et seq. In re Adoption of X.J.A.,* 36 Kan. App. 2d 621, 142 P.3d 327 (2006). Our jurisdiction is pursuant to K.S.A. 20-3018(b) (petition for review granted from adoptive parents).

The issues on appeal and our accompanying holdings are as follows:

1. Did the district court err in applying the doctrine of "substantial compliance" to the statute governing written consent for adoption, K.S.A. 59-2114? No.

2. Did substantial competent evidence support the district court's finding that Mother failed to establish that her consent was involuntarily given? Unnecessary to address.

3. Did substantial competent evidence support the district court's finding that the adoptive parents were in a common-law

marriage, thus providing the court jurisdiction to grant a decree of adoption? Yes.

Nevertheless, we reverse the Court of Appeals and remand to the district court for further proceedings.

## FACTS

A.A. (Mother) was born in Mexico City, Mexico, in early 1979. She moved to the United States with her family when she was 10 years old. Mother attended school in this country until approximately 1997, but did not complete high school or obtain a GED.

In March or April 2003, 24-year-old Mother learned she was pregnant. At the time, she was living in a trailer in Garden City, Kansas, with J.S. (Father), the biological father, and G.P.A., her 13-month-old daughter from a previous relationship. Shortly after Father learned she was pregnant, he moved out. Two months later, Mother was evicted, so she and her daughter moved in with her neighbor Guadalupe.

Mother allegedly told Guadalupe on two separate occasions that she desired an abortion. Guadalupe offered to help her so that she would not have to abort the child.

When Mother was 5 or 6 months pregnant, she met Guadalupe's sister, M.A., and M.A.'s companion, E.M., who had lived together for 14 years. Although they wanted children, M.A. had been unable to conceive. According to M.A., Mother called and asked if M.A. would adopt Mother's baby because she did not know how she would care for two children. M.A. later discussed the possible adoption with Mother in Guadalupe's home. When Mother was 7 or 8 months pregnant, she allegedly told Guadalupe, "Now, I'm going to give the baby to [M.A.]." M.A. and E.M. later consulted an adoption attorney, David Snapp.

Mother continued living in Guadalupe's home until December 2003. On December 20, Guadalupe, her brother Isaac, and three friends took Mother to the Garden City hospital when she went into labor. Both Guadalupe and M.A. stayed with Mother during labor. On December 21, in M.A.'s presence, Mother gave birth to a girl whom M.A. and E.M. named X.J.A.

On December 23, Guadalupe picked Mother up from the hospital. That same day, M.A. and E.M. signed a Petition for Adoption in attorney Snapp's office and obtained from him a form entitled Consent to Adoption of Minor Child. The girl remained in the hospital for 3 more days due to health concerns. During this time, Mother visited her daily and received counseling and education for new mothers.

On December 24, Mother signed the adoption consent form presented by M.A. Among other things, the form states: "I hereby consent and agree to the adoption of [X.J.A.] by [E.M.] and [M.A.] I have read and I understand the above consent and I am signing as my free and voluntary act."

When M.A. returned the form to Snapp in Dodge City that same day, he reminded her that Mother's signature required acknowledgment. She then took the consent to a notary acquaintance in Garden City who had prepared her tax returns. According to M.A., she told the notary "all that happened." After M.A. complied with the notary's request to see the baby and accepted congratulations, the notary "notarized the paper." Mother was not present and there is no evidence that the notary knew her. The preprinted acknowledgment is also dated December 24, 2003, and states, in relevant part:

"I, a notarial officer in and for the County [Finney] and State aforesaid, certify that [Mother], whose name is subscribed to the above and foregoing consent, appeared before me in person and duly acknowledged execution of the above consent and duly acknowledged that the statements made in the foregoing consent are true."

On December 26, X.J.A. was discharged from the hospital; M.A. and E.M. were present. Although the girl was discharged to Mother, she gave the girl to M.A. as they prepared to leave the hospital. X.J.A. went home to Dodge City with M.A. and E.M. while Mother went to Guadalupe's residence in Garden City. M.A. and E.M. agreed to let Mother see X.J.A. each weekend and indeed later made multiple trips to Garden City for this purpose.

Shortly after X.J.A. was born, Mother enrolled her in the Women Infants Child (WIC) program, a food assistance program in which Mother participated with her other daughter. Mother provided

items from the program to M.A. Mother also obtained health insurance for X.J.A., and took her to two medical appointments for vaccinations.

On December 29, Snapp filed a petition for adoption, attaching a copy of Mother's purported consent from 5 days earlier. An affidavit for publication service was filed in January 2004, and a hearing on the petition was scheduled for February 24, 2004.

In February 2004, Mother traveled from Garden City to Dodge City where she met with Snapp and M.A. Mother answered questions about herself and Father. According to M.A., Mother communicated with Snapp in English.

In March 2004, the district court conducted a fitness hearing for M.A. and E.M. After hearing evidence, the court concluded that they were "fit and proper persons to take temporary custody and provide care and support of the minor child, [X.J.A.]."

According to Mother, when M.A. and E.M. stopped allowing her to visit X.J.A. in May 2004, she went to their home in Dodge City to ask for her daughter. Police were called and the adoptive parents gave the police documents showing that an adoption proceeding had commenced. E.M. later testified that this was the first time he knew there was a problem.

On October 19, 2004, Mother filed a motion to withdraw consent to adopt. In the motion, she admitted that she signed "something" but did not admit to signing anything she believed to be a consent to adopt. Nor did she admit to freely and voluntarily giving her consent to the adoption of X.J.A.

In July 2005, after hearing arguments, the district court denied Mother's motion for summary judgment. The court later found, among other things, that the adoptive parents had the burden of proving Mother signed the consent and if they met this burden, the burden shifted to Mother to establish the consent was not freely and voluntarily given.

Trial occurred in November 2005, with 16 witnesses testifying. Consistent with the court's prior ruling, the adoptive parents began and presented testimony from their attorney's assistant who essentially obtained writing exemplars from Mother and provided them to forensic document examiner, Barbara Downer. Downer testified

that in her expert opinion, the signature on the consent form was Mother's.

Based on this initial testimony, the district court ruled that the adoptive parents established their prima facie case that Mother's signature appeared on the consent and that the burden then shifted to Mother to rebut this prima facie evidence. After Mother presented the testimony of her fianc, Michael Ibarra, the court found that evidence of her signature had not been rebutted. Mother then proceeded with other evidence and attempted to meet her burden that the consent was involuntary.

Conflicting evidence was presented as to whether Mother ultimately agreed to the adoption. During trial, both Mother and M.A. testified through an interpreter. Under direct examination by her attorney, Mother admitted signing a document on December 24:

"Attorney: Do you know if that's your signature?
"Mother: Yes, it's mine.
"Attorney: You're sure you signed that document?
"Mother: I don't remember signing it, but that signature is mine."

In addition to admitting her signature, Mother admitted that she filled in the consent's blanks for her age, place and date of birth, and the day she signed. She testified, however, that she did not know what the document was.

Mother denied that she ever told Guadalupe's family that she would give up the child. Rather, she believed that M.A. and E.M. were simply going to help her take care of the new baby; she did not believe they were going to keep X.J.A. permanently. In support, Mother asserted that she told a nurse at the hospital that the baby was not being given up for adoption.

Mother testified that she signed a document in a car outside of Guadalupe's sister Sylvia's house. She did not understand the document and she felt pressured into signing it. She believed that she was signing something "[s]o, that there would be difficulties to take the baby back." Mother also testified that when she met with Snapp in Dodge City, she did not know the purpose of the visit. Nevertheless, she did not question why she was visiting M.A.'s and E.M.'s attorney.

M.A.'s version of events was quite different. She denied that Mother was in a car when she signed the consent form. Rather, M.A. asserted that she met with Mother at M.A.'s sister Sylvia's house, where she told Mother to read and sign the form. Mother read it slowly. When she finished reading the form, Mother asked for a pen, filled in the blanks, signed and gave it back to M.A. Mother did not ask any questions.

According to M.A., Mother signed the form between 7 and 8 p.m. in the presence of M.A. and M.A.'s family including Guadalupe, Sylvia, Isaac, and their mother. M.A. believed Mother "knew what she was signing" and understood the content of the consent form "because when she was pregnant she told me that she was going to give her [X.J.A.] to me." M.A. testified that she also had earlier observed Mother speak English and fill out the hospital papers in English. To M.A.'s knowledge, no one ever put pressure on Mother to sign the consent.

Like her sister M.A., Guadalupe contradicted Mother's assertion that the consent was signed in the backseat of a car. She stated that the consent was signed at Sylvia's house in front of several witnesses. When asked if she had any reason to believe that Mother did not understand that E.M. and M.A. were going to adopt the baby, Guadalupe said, "I never thought that, no. It appeared to me that it was all right with her."

Similarly, M.A.'s other sister, Sylvia, discussed Mother's ability to read and understand English. Sylvia testified that Mother did not ask any questions about the consent form "because she knows how to read English very well. And she has read letters for me, and she's interpreted them [from English to Spanish]."

M.A.'s brother Isaac testified that Mother told him she was contemplating abortion. When asked about Mother's statement that she does not speak or read English, Isaac stated, "she understands. And, she talks, and she writes. . . . and [on one occasion] she served as my interpreter." Concerning the consent form, he testified that Mother filled in the blanks in his presence. She did not ask any questions about it because based upon his experience with her, "she knows very well to read and to write English." He confirmed that she read the consent, asked for a pencil, and signed.

M.A.'s companion, E.M., testified that Mother called M.A. to tell her that they could adopt her child. The two later drove to Garden City from their home in Dodge City to discuss the details with Mother. After X.J.A. was born, E.M. did not believe anything had changed because Mother had previously told M.A. they could adopt the child.

Snapp testified about his communication with Mother in early 2004 in his office. According to Snapp, he asked for answers to questions contained in a state form concerning background information for a child being adopted. He recorded her responses in English. These responses include the medical history of the child; the genetic, medical, and social history of Mother, including her mother's diabetes and her death from childbirth complications; and the genetic, medical, and social history of Father, including his birthdate and some employment history. Snapp talked to Mother entirely in English. She did not give him any reason to believe that she did not understand why they were meeting, what she was doing, and the consequences of her actions.

The district court issued an 11-page memorandum decision the following month. After confirming it had found that the adoptive parents had demonstrated Mother's signature on the consent, it also found that the signature constituted substantial compliance with the statutory requirement for an attested signature and that the burden of proof shifted to Mother:

"2. The evidence presented by Petitioners establishes [Mother's] signature on the Consent to Adoption (even though not signed in the presence of a notary public) [and] *constitutes substantial compliance with the statutory requirement for an attested signature,* which satisfies the requirement of proof that the natural mother did consent to the adoption of the child herein, and the burden shifts to the natural mother to show that the consent was not freely and voluntarily given." (Emphasis added.)

The court further found that Mother did understand the consent that she was signing on December 24:

"18. . . . [T]he evidence established the fact that the consent form was discussed and reviewed at the home of [Sylvia] Adame before [Mother] signed it (contrary to [Mother's] testimony that she signed the form in the back seat of a car *and did not know what she was signing)."* (Emphasis added.)

In its conclusions of law, the court set forth the purpose of the notarized signature on a consent form:

"7. The provisions of K.S.A. 53-501 include requirements for attesting to signatures, for the purpose of proving the signature appearing on the document is in fact that of the person who is purportedly signing the document, but *the notarized signature provides only a prima facie proof that the person who* is identified on the document is the one who in fact signed it for the purpose asserted in court." (Emphasis added.)

The court further concluded as a matter of law:

"8. It would be patently unjust if the purpose of the notarial requirement for consents to adoption (*to attest a free and voluntary consent*) was defeated by a notarial officer's failure to comply with the signature requirements where the signature is in fact genuine." (Emphasis added.)

The court concluded that Mother had failed to meet her burden and held that she voluntarily and without coercion signed the adoption consent form for the purpose of effecting the adoption of X.J.A. It therefore granted parental rights to the adoptive parents, terminated Mother's rights, and changed the girl's name.

The Court of Appeals held that the correct inquiry was not whether Mother's consent was in substantial compliance with Kansas adoption statutes, but rather with the Uniform Law on Notarial Acts, K.S.A. 53-501 *et seq.* It declared that because there was no substantial compliance with that act, the statutory burden of proof was unconstitutionally shifted to the Mother to demonstrate the consent was not given freely and voluntarily.

"[T]he parent's statutorily imposed burden is to refute the prima facie case for voluntariness established by the valid acknowledgment. However, we do not believe that an acknowledgment which does not substantially comply with the law of notarial acts can establish the requisite prima facie case. Without the prima facie showing via a substantially valid acknowledgment, the parent must, in the first instance, bear the burden of proving that his or her fundamental liberty interest should not be taken. Pursuant to the rationale of *In re J.L.,* that burden shifting would violate the parent's right to procedural due process." 36 Kan. App. 2d at 629-30.

Accordingly, the Court of Appeals reversed the district court without remand.

## ANALYSIS

**Issue 1:** *The district court did not err in applying the doctrine of "substantial compliance" to the statute governing written consent for adoption, K.S.A. 59-2114.*

The adoptive parents argue that they substantially complied with the statutory requirements for a natural parent's consent to adoption. Mother essentially responds that the lack of a proper acknowledgment renders her purported consent void ab initio.

Consent by the natural parents to the adoption of their child, where required by statute, is regarded as an essential requisite to the court's jurisdiction to render a valid decree of adoption. *In re Adoption of Trent*, 229 Kan. 224, 228, 624 P.2d 433 (1981). Whether jurisdiction exists is a question of law over which we exercise unlimited review. *Schmidtlien Electric, Inc. v. Greathouse*, 278 Kan. 810, 830, 104 P.3d 378 (2005). Additionally, resolution of this issue necessitates statutory interpretation over which this court also exercises unlimited review. 278 Kan. at 819.

Our analysis starts with the adoption consent statute, K.S.A. 59-2114(a), which provides:

"Consent shall be in writing and *shall be acknowledged* before a judge of a court of record or *before an officer authorized by law to take acknowledgments*. If consent is acknowledged before a judge of a court of record, it shall be the duty of the court to advise the consenting person of the consequences of the consent. A consent is final when executed, unless the consenting party, prior to final decree of adoption, alleges and proves by clear and convincing evidence that the consent was not freely and voluntarily given. The burden of proving the consent was not freely and voluntarily given shall rest with the consenting party." (Emphasis added.)

"Acknowledgment" is defined in relevant part in the Uniform Law on Notarial Acts as "[a] declaration by a person that the person has executed an instrument for the purposes stated therein." K.S.A. 53-502(b).

The act further provides that in taking an acknowledgment, "the notarial officer must determine, either from personal knowledge or from satisfactory evidence, that *the person appearing before the officer* and making the acknowledgment is the person whose true

signature is on the instrument." (Emphasis added.) K.S.A. 53-503(a).

"Satisfactory evidence" is defined as follows:

"A notarial officer has satisfactory evidence that a person is the person whose true signature is on a document if that person is (1) personally known to the notarial officer, (2) identified upon the oath or affirmation of a credible witness personally known to the notarial officer or (3) identified on the basis of identification documents." K.S.A. 53-503(f).

A notarial act must be evidenced by a signed and dated certificate. K.S.A. 53-508(a). Under Kansas' approved short form certificate of notarial acts, an acknowledgment in an individual capacity may simply provide as follows: "This instrument was acknowledged before me. . . ." K.S.A. 53-509.

It is undisputed that the notary public did not fulfill her obligations under Kansas law. Nor did she comply with the representations made in her certificate of acknowledgment: among other things, Mother did not personally appear nor did she acknowledge her execution and the truth of the statements in her consent, *i.e.*, reading and understanding and signing freely and voluntarily.

We have stated that the provisions of the adoption statutes must be strictly construed in favor of maintaining the rights of natural parents in controversies involving termination of the parent-child relation. *In re Adoption of Trent*, 229 Kan. at 228. We have also stated that a natural parent's right to the custody of his or her child is a fundamental right protected by the Fourteenth Amendment to the United States Constitution. *In re Guardianship of Williams*, 254 Kan. 814, 869 P.2d 661 (1994).

Nevertheless, this court has not required strict compliance with adoption statutes but has followed the doctrine of substantial compliance. In 1896 we stated: "Where the adoption of children is regulated by statute, as in . . . Kansas, rights of inheritance can only be acquired through adoption by a substantial compliance with the provisions of the statute." *Renz v. Drury*, 57 Kan. 84, Syl. ¶ 2, 45 Pac. 71 (1896). There we held there was "no evidence" of compliance with the statute. 57 Kan. at 89. We have defined the doctrine as "compliance in respect to the essential matters neces-

sary to assure every reasonable objective of the statute." *Orr v. Heiman,* 270 Kan. 109, 113, 12 P.3d 387 (2000).

In *In re Adoption of Trent,* 229 Kan. 224, this court applied the doctrine to overrule the district court and the Court of Appeals. There, the issue was whether the natural mother's written consent to adoption was valid where it was acknowledged in her presence in Missouri by a Kansas notary public without authority to act beyond the boundaries of Kansas. 229 Kan. at 225-27. The district court held that although the consent was voluntarily given, it was nevertheless invalid because the acknowledgment was not executed according to the law. The Court of Appeals agreed, stating that the defect in the acknowledgment was not a mere irregularity and the doctrine of substantial compliance therefore could not be applied.

In a 5-2 decision, the *Trent* court held that the consent was in substantial compliance with K.S.A. 59-2102 which, similar to its successor statute, K.S.A. 59-2114, stated that "the written consent *shall* be acknowledged before an officer authorized by law to take acknowledgments." (Emphasis added.) After determining substantial compliance and finding that the record left "no question that the written consents were freely and voluntarily given," 229 Kan. at 229, we stated:

"A consent to adoption executed in substantial compliance with statutory require-
ments is valid under K.S.A. 59-2102 *in view of subsequent judicial proceedings
which were instituted by the natural mother and which afforded her a full hearing
upon all issues* bearing upon voluntariness of her consent." (Emphasis added.)
229 Kan. 224, Syl. ¶ 4.

Thirteen years later in *In re Adoption of J.H.G.,* 254 Kan. 780, 869 P.2d 640 (1994), a now unanimous court appeared to go even further than in *Trent.* In this case which was not addressed by the Court of Appeals, the natural mother argued that deficiencies in both the adoption petition and its required accompanying documents divested the district court of jurisdiction to grant the adoption. 254 Kan. at 793-99. Specifically, the petition failed to state as required by K.S.A. 1993 Supp. 59-2128: (1) the time of the child's birth; (2) the dates of birth of the child's parents; (3) the facts relied upon as eliminating the necessity for the natural father's consent

since his consent was not obtained; (4) information required by the Uniform Child Custody Jurisdiction Act (UCCJA), *e.g.*, the child's present address and where he or she had lived within the past 5 years; and (5) a statement concerning whether the Interstate Compact on the Placement of Children or the Indian Child Welfare Act (ICWA) applied. The missing documents required to accompany the adoption petition were the child's and natural parents' background information pursuant to K.S.A. 1993 Supp. 59-2130 and the detailed accounting of the expenses paid by the adoptive parents pursuant to K.S.A. 1993 Supp. 59-2121. 254 Kan. at 795-96.

The *J.H.G.* court acknowledged that "K.S.A. 1993 Supp. 59-2128 does use mandatory language ('shall')." See subsection (a) ("A petition for adoption . . . *shall* state"); see also subsection (f) ("[T]he background information required by K.S.A. 59-2130, and . . . the accounting required by K.S.A. 59-2121 . . . *shall* be filed with the petition for adoption."). (Emphasis added.) Nevertheless, this court held "we are unable to find that the absence of one or more of those requirements necessarily divests a court of jurisdiction to grant a petition for adoption." 254 Kan. at 796-97. The *J.H.G.* court applied the doctrine of substantial compliance and the holding of *Trent* to uphold the adoption.

In applying the doctrine and *Trent's* holding, the *J.H.G.* court allowed the adoptive parents to meet a number of these statutory requirements with other information contained in the pleadings. "Where a document filed contemporaneously with a petition for adoption includes the requisite information, though that information is not included in the petition for adoption itself, a party has substantially complied with the requirements of K.S.A. 1993 Supp. 59-2128." 254 Kan. at 797. For example, the court noted that the consent to adoption filed with the petition stated the time of the child's birth and the natural mother's date of birth; the petition itself provided the child's date of birth and stated that the natural father's whereabouts were unknown; and the consent of the natural mother's husband, while not the natural father, was also filed with the adoption petition.

Concerning the adoptive parents' failure to attach an accounting to the adoption petition, the *J.H.G.* court acknowledged that what is now K.S.A. 59-2128(f) and K.S.A. 59-2121(b) use "shall." K.S.A. 59-2121(b) states: "In an action for adoption, a detailed accounting of all consideration given, or to be given, and all disbursements made, or to be made, in connection with the adoption and the placement for adoption *shall* accompany the petition for adoption." (Emphasis added.) Nevertheless, the court held that the later filing of the accounting with the decree of adoption "appears to be substantial compliance with K.S.A. 1993 Supp. 59-2121." 254 Kan. at 797. The court apparently believed that because "[t]he purpose of requiring an accounting under 59-2121 in part is to [ensure] that the adoptive parents are not improperly paying more consideration to the natural parents than is permitted by statute," that purpose had been served because the accounting "was available to the trial court before the adoption decree was finalized." 254 Kan. at 797.

Concerning the failure to attach a statement of background information to the petition, the *J.H.G.* court effectively acknowledged that what is now K.S.A. 59-2128(f) and K.S.A. 59-2130(a) also use "shall." K.S.A. 59-2130(a) states: "The following information *shall* be filed with the petition . . . (1) A complete written genetic, medical and social history of the child and the parents . . . ." The court found this failure "troubling" because "[t]he purpose or necessity of including this information in the petition for adoption is to benefit the child as it is useful in medical care and treatment." 254 Kan. at 798. Some of the missing information admittedly was contained in the home study filed contemporaneously with the adoption petition, but the court observed that none came from the natural parents. Nevertheless, the court upheld the district court's finding of substantial compliance with this requirement because it was supported by substantial competent evidence.

The absolute failure of the adoptive parents to provide other information required by 59-2128 was pardoned because it had no bearing on the adoption. "Substantial compliance with K.S.A. 1993 Supp. 59-2128 can also be found even when neither the petition for adoption nor the documents filed contemporaneously with the

petition include some of the required information, if it is clear that the information lacking has no bearing on the adoption." 254 Kan. at 797. The court held that the purpose of requiring the petition to provide information concerning the UCCJA, Interstate Compact on the Placement of Children, and the ICWA "is to merely insure that the trial court is informed when those acts do apply." 254 Kan. at 798. We stated that because those acts "were not issues in this case, the absence of this information from the petition for adoption does not preclude a finding of substantial compliance here." 254 Kan. at 798. The court also concluded that only the natural father, not the mother, had standing to challenge the petition's failure to include the required " 'facts relied upon as eliminating the necessity for the consent' " of the natural father and the resultant failure by the adoptive parents to include in the petition a request to terminate his parental rights under K.S.A. 1993 Supp. 59-2136. 254 Kan. at 799.

Our opinions in *Trent* and *J.H.G.* establish several key points for guidance to the instant case. First, in *Trent,* we held that a failed attempt at acknowledgment did not preclude substantial compliance with the acknowledgment requirement. Here, we have an attempt at acknowledgment that failed because the notary did not comply with Kansas requirements and all the representations contained in her certificate, *e.g.*, the signer did not personally appear before her.

Second, in *Trent* we held that a consent to adoption executed in substantial compliance with statutory requirements is valid under a consent statute in view of subsequent judicial proceedings which were instituted by the natural mother and "which afforded her a full hearing upon all issues bearing upon voluntariness of her consent." 229 Kan. 224, Syl. ¶ 4. Here, the natural mother instituted judicial proceedings by filing a motion to withdraw her consent which led to a 2-day evidentiary hearing in which 16 witnesses testified and numerous issues bearing upon the adoption were explored, *e.g.*, her signature and the voluntariness of her consent.

Third, in both *Trent* and *J.H.G.,* we essentially held that the presence of the word "shall" in adoption statutes—statutes which are to be strictly construed in favor of the rights of natural parents

because of the potential termination of the parent-child relation—nevertheless does not mandate strict and total compliance with those requirements. Here, K.S.A. 59-2114 provides that consent "shall be acknowledged . . . before an officer authorized by law to take acknowledgments."

Fourth, we held in *J.H.G.* that failures to comply with "shall" requirements, *e.g.*, K.S.A. 59-2128(a) ("A petition for adoption . . . shall state") nevertheless can be cured with information from other sources, so long as the statutory purpose is met. There, it included a late-filed accounting. Indeed, even failures to provide certain required information can be ignored, so long as the missing information has no bearing on the issues in the case, *e.g.*, the ICWA. Here, although there was no proper statutory acknowledgment, before the district court issued its memorandum decision it received evidence concerning Mother's signing of the consent, her understanding of what she was signing, and whether she signed freely and voluntarily.

Fifth, in *J.H.G.* we held that the determination of substantial compliance with a statutory requirement is a finding of fact by the district court which will not be disturbed on appeal if supported by substantial competent evidence. There, it was a requirement to file a statement of full background information with the petition. Here, the district court found substantial compliance with the statutory requirements for an attested signature. We hold that most of the finding is supported by substantial competent evidence in the record, *e.g.*, evidence regarding Mother's signing of the consent and her understanding of what she was signing. Whether that part of the court's finding that she consented freely and voluntarily is also supported by substantial competent evidence, however, is addressed in issue 2.

As mentioned, "substantial compliance" is " ' "compliance in respect to the essential matters necessary to assure every reasonable objective of the statute." ' " *Orr v. Heiman,* 270 Kan. at 113. The main objective is to obtain consents to adopt in writing "to insure that the natural parent freely and voluntarily consents to the adoption." *Trent,* 229 Kan. at 228. Here, the natural mother's reading and signing of the consent was observed by five witnesses; a later

acknowledgment, although poorly performed, was obtained that same day after the adoptive mother told the notary "all that happened." And despite the holding of substantial compliance with the adoption consent statute by the *Trent* court in 1981, and despite this doctrine's more expansive application in the adoption context by the *J.H.G.* court in 1994, we observe that the legislature has taken no steps in reaction to those decisions. For example, it has not clearly articulated any adoption consequences for failure to properly acknowledge. We find this inaction indicative of legislative approval and ratification. See *State v. Ayers,* 198 Kan. 467, Syl. ¶ 3, 426 P.2d 21 (1967) ("Failure of the legislature to change a law after judicial construction for a long period amounts to legislative approval and ratification.").

We recognize that the specific deficiency in the instant case—an acknowledgment improper in several ways—was not present in *Trent* or among the multiple deficiencies in J.H.G. We also recognize that the present deficiency is a key one: It goes directly to whether consent was adequately given. Accordingly, for additional support we also examine a case relied upon by the *Trent* court whose single deficiency was even more severe than the one presently before us: a complete failure to acknowledge the natural parents' signatures on their consents as required by statute.

In *Riley v. Byrne,* 145 Mont. 138, 399 P.2d 980 (1965), the natural father was a brother to the female adoptive parent. Both natural parents signed consents to adoption in the presence of the adoptive parents and the grandfather. Later, they filed suit to set aside the adoption decree. Among other things, they argued "that the consents were deficient and not executed pursuant to statute in that the acknowledgments were not made 'before an officer authorized to take acknowledgments.'" 145 Mont. at 141. As described by the *Trent* court, the Montana statute, "RCM 1947, § 61-205 (now Mont. Codes Ann. § 40-8-111) provided, in pertinent part, that consents '*shall be acknowledged* before an officer authorized to take acknowledgments, or witnessed by a representative of the state department of public welfare or of an agency, or witnessed by a representative of the court.'" (Emphasis added.) 229 Kan. at 231.

Despite the complete lack of acknowledged consents, and apparent lack of any attempt to obtain acknowledgments, the *Riley* court upheld the adoption, ruling that it "was valid and legal." 145 Mont. at 145. In language later fully quoted by the *Trent* court and then paraphrased as *Trent's* point of law in syllabus paragraph 4, the Montana Supreme Court stated:

> "In the case before us, the consents of the natural parents were obtained without observing the necessity of acknowledgment. Thereafter, *these natural parents instituted judicial proceedings which afforded them a full hearing upon all issues bearing upon the voluntariness of their consents and the adoption proceedings generally. To deny the validity of a decree of adoption for lack of acknowledgment when the natural parents have fully exercised those rights which such acknowledgment was designed to protect would, we think, reach a result contrary to the spirit of our adoption statutes.* This result is in harmony with decisions of other courts which have considered similar questions." (Emphasis added.) 145 Mont. at 145.

As additional support, we also examine the more recent case of *In re Adoption of Infant Child Baxter*, 799 N.E.2d 1057 (Ind. 2003). There, the Indiana Supreme Court faced facts even more similar to the instant case, *e.g.*, an improperly performed notarial act. The mother of the natural mother was a friend of the adoptive mother. The natural mother, natural father, and the maternal grandparents signed adoption consents prepared by the adoptive parents' attorney. Afterward, as in the present case, an adoptive parent took the already-signed consents to a notary public who notarized them all—outside the signers' presence. This procedure was contrary to Indiana law which, similar to Kansas law, provides that a notary shall not acknowledge the execution of an instrument unless the person who executed it: (1) signs the instrument before the notary, or (2) affirms to the notary that the signature on the instrument is the person's own. 799 N.W.2d at 1059. As in the instant case, the adoptive parents went to the hospital for the birth and received delivery of the baby from the natural parents.

The natural mother and her mother later contacted the adoptive parents to revoke their consent and reclaim custody. Approximately 1 month later, the natural parents and both sets of grandparents filed suit to dismiss the adoption petition. The trial court found

that the signatures on the consents had not been executed in the presence of a notary public as required by the Indiana notary statute and, consequently, under the Indiana consent statute, the consents had been improperly notarized and were therefore void. The Court of Appeals affirmed.

In reversing the trial court and Court of Appeals, the Indiana Supreme Court first acknowledged that the Indiana consent statute *"requires* the written consent [to adoption] to be executed in the presence of any one of six specified entities" ([emphasis added] 799 N.W.2d at 1062), including "a notary public or other person authorized to take acknowledgments." Ind. Code Sec. 31-19-9-2.

The *Baxter* court also acknowledged the natural parents' argument, similar to the instant case, that the consent statute set forth a mandatory and exclusive regimen for executing consents to adoption; because the consents were not executed in the presence of any of the entities listed in the statute, the consents were invalid and void ab initio. The court further recognized their argument, also similar to the one in the instant case, that the Adoption Code must be strictly construed in favor of the rights of natural parents. It also acknowledged the adoptive parents' opposing arguments, *e.g.*, that the failure of the consents to meet the consent statute specifications does not render the consents invalid but only denies their presumptive validity.

The *Baxter* court held that "the consents did not conform to the *requirements* of the Consent Statute because they were not executed in the presence of any one of six specified entities." (Emphasis added.) 799 N.E.2d at 1062. Nevertheless, it rejected the lower courts' holdings that this failure rendered the consents invalid and void. Instead, it held that "if the written consent is not properly notarized, *the validity of the consent* may nevertheless be satisfied by evidence that the signatures are authentic and genuine in all respects and manifest a present intention to give the child up for adoption." (Emphasis added.) 799 N.W.2d at 1058. The court implicitly accepted the adoptive parents' argument that the failure to meet the statutory notarization requirement only denied the consents their "presumptive validity." The court reversed and remanded for a trial court determination of whether the consents are

authentic and valid despite not being executed in the notary's presence, noting that the trial court had already found that the natural parents and maternal grandparents had knowingly and voluntarily signed the consents. 799 N.W.2d at 1063.

Both the *Riley* and *Baxter* decisions are consistent with the opinions of this court, which do not require strict compliance with statutory adoption requirements. They are particularly consistent with *J.H.G.*, which allowed those requirements to be met in alternate ways. They are also consistent with *Trent*, whose holding relied at least in part upon the natural parents' participation in full evidentiary hearings on many of the adoption issues. As stated in *Riley*: "[T]he natural parents have fully exercised those rights which such acknowledgment was designed to protect." 145 Mont. at 145.

*Baxter's* implicit acceptance of the adoptive parents' "presumptive validity only" argument is also consistent with language in *Trent* regarding the acknowledgment's function. In reviewing a predecessor to the current Kansas consent statute, the *Trent* court first explained the purpose of the written consent requirement: "The purpose and necessity of a written consent is to [ensure] that the natural parent freely and voluntarily consents to the adoption." 229 Kan. at 228.

After explaining the purpose of the written consent, the *Trent* court then reviewed the purpose served by the acknowledgment described in the consent statute: "The acknowledgment serves as *prima facie proof* of the [1] validity of the consent, and [2] the identity of the signer." (Emphasis added.) 229 Kan. at 228. It also explained an additional purpose of the consent's statutory acknowledgment: "The acknowledgment also serves as *prima facie proof* that the written consent was freely and voluntarily given," and once obtained and filed "becomes irrevocable absent proof that the consent was not freely or voluntarily given." (Emphasis added.) 229 Kan. at 228. It noted that after acknowledgment, the burden then shifted: "K.S.A. 59-2102 specifically states that the burden of proving the absence of free and voluntary consent will be on the consenting party or parties." 229 Kan. at 228.

The *Trent* court thus placed the function of the prima facie proof in its proper context. Based upon *Trent,* and foreshadowing the

adoptive parents' argument in *Baxter,* this court later described the acknowledgment in adoptions as providing a "presumption of validity." *In re Adoption of Irons,* 235 Kan. 540, 547, 684 P.2d 332 (1984) ("In order to rebut the presumption of validity there must be a showing of fraud, duress, undue influence, mistake or lack of understanding.").

In light of all these authorities, we conclude that the later acknowledgment outside the natural mother's presence does not render her consent void as a matter of law. The district court is correct in that regard. The acknowledgment only serves as prima facie proof, *e.g.,* of the validity of the consent, the identity of the signer, and that the consent was freely and voluntarily given. See Black's Law Dictionary 1228 (8th ed. 2004) (defining "prima facie" as [s]ufficient to establish a fact or raise a presumption unless disposed or rebutted."); see *Welch v. Via Christi Health Partners, Inc.,* 281 Kan. 732, 768-69, 133 P.3d 122 (2006) ("The plaintiffs have not established a prima facie case of a breach of the fiduciary duties of loyalty and good faith and fair dealing . . . sufficient to shift the burden of proof to the defendants to establish the fairness of the transaction."); *In re Jones,* 228 Kan. 90, 114, 612 P.2d 1211 (1980) ("Prima facie evidence" merely creates a presumption which may be overcome by evidence from the other party.") (Holmes, dissenting).

With an acknowledgment providing prima facie proof, the adoptive parents could enjoy, among other things, several advantages that it provides under K.S.A. 59-2114: (1) the consenting party must prove that the consent was not freely and voluntarily given; and (2) the proof must be by clear and convincing evidence. However, without an acknowledgment, no "presumption of validity" has been established. See *In re Adoption of Irons,* 235 Kan. at 547; see *Baxter,* 799 N.E.2d 1057. Absent prima facie proof through acknowledgment, the signer identity and the consent validity and voluntariness may be met by the adoptive parents through alternate prima facie evidence. *Cf. J.H.G.,* 254 Kan. 780 (required statement of background information essentially supplied by home study; required accounting filed late but in time to be considered by the court before its decision).

Accordingly, the district court correctly placed the burden of providing prima facie evidence—the functional equivalent of the acknowledgment—on the adoptive parents. Specifically, it correctly placed this burden of prima facie evidence on the parents on the issue of Mother's signature appearing on the consent. It also correctly placed the burden of rebutting this prima facie evidence on Mother. It further correctly determined that Mother had failed in her rebuttal and the signature was therefore established as hers. See Black's Law Dictionary definition of "prima facie."

The court erred, however, in shifting the burden of proving involuntary consent to the natural Mother once the adoptive parents had established her signature on the consent. It erred because the prima facie evidence of other matters typically provided by the acknowledgment were still missing, *e.g.*, that the consent was voluntary. See *Trent,* 229 Kan. at 228 (under the statute, "[t]he acknowledgment also serves as prima facie proof that the written consent was freely and voluntarily given"). There was no determination made by the district court that the burden had been placed on the adoptive parents to provide prima facie evidence on the voluntariness of the consent. Nor does a review of the parents' evidence— before the court ordered the shift in burden of proof—reveal any establishing of such evidence. The only witnesses were two people who had not been present when the signature was placed on the consent. One witness was the expert who opined that the signature was Mother's, and the other was one who essentially functioned as a foundation witness: an assistant who obtained and provided Mother's writing exemplars to the expert. The consequences of this court error are analyzed in issue 2.

**Issue 2:** *It is unnecessary for us to address whether substantial competent evidence supports the district court's finding that Mother failed to establish that her consent was involuntarily given.*

Mother argues that the district court's finding that she had not established that her consent was involuntarily given was not supported by substantial competent evidence. The Court of Appeals noted that while its earlier holding made discussion of the evidence unnecessary, Mother was asking the court to reweigh evidence. It

further noted that the district court had made a negative finding that required a different standard of review. We need not address Mother's argument; as we mentioned in issue 1 regarding the impact of a poorly performed acknowledgment, this shift of the burden of proof to Mother was incorrect because there was no prima facie case presented on the voluntariness of the consent.

Generally, we would remand for the district court to determine whether the adoptive parents had made their prima facie showing and eventually to determine whether the consent had been given voluntarily and freely. In *In re Adoption of Irons*, 235 Kan. 540, however, this court held that while the trial court improperly placed the burden of proof on the natural mother on whether her consent was freely and voluntarily given or tainted by undue influence, "[t]he error does not necessarily warrant reversal as it would in a jury trial. The record must be examined to determine if the evidence shows the appellees sustained the burden of proof which should have been placed upon them at trial." 235 Kan. at 550. We held:

"[W]e have no hesitation in holding appellees [adoptive parents] sustained their burden of proof. This was a trial to the court. The parties introduced all the evidence they had. The order of events did not affect the result since the court had available to it all the evidence, virtually all of which was uncontested. Thus, the resolution of this controversy was primarily that of weighing the evidence. We think the answer is clear and accordingly hold that Anjanette Irons [mother] freely, knowingly and voluntarily gave her consent to the adoption of Baby Boy Irons." 235 Kan. at 553.

In her brief, Mother argued that she had a limited education, and although she could understand a "little" English when spoken to, she could not read English. She alleged that the consent was never explained to her. Mother further pointed to evidence that the nurses at the hospital did not document that her daughter was up for adoption, that the child was discharged to her, and that she took the child to medical check-ups. Finally, she noted that the testimony was conflicting regarding whether Mother intended to have M.A. and E.M. adopt the child.

The adoptive parents responded that (1) Mother's ability to read and speak English was evident throughout the proceedings; (2) she

was 24 years old when she signed the consent; (3) she did not request legal counsel before signing; and (4) she delivered the girl to M.A. and E.M. after the child was discharged to her. We independently observe that Mother attended elementary, junior high, and high school in this country. According to the record, she acted as an interpreter for Spanish speakers applying for work. She also translated a letter from English to Spanish for M.A.'s sister, Sylvia. M.A.'s brother Isaac testified that Mother knew how to read and write English and had previously translated for him. She met with attorney Snapp in early 2004 and answered questions and conversed in English without difficulty.

We also independently observe that 16 witnesses testified during a 2-day hearing. Important, contradictory consent testimony came from the principals who have much to gain or lose: a natural mother versus the adoptive parents. Important, contradictory consent testimony also came from Mother's fianc and many of M.A.'s blood relations. Both the gravity of what is at stake—who will be the parents of a young girl—and the close relationships of many of the witnesses, carry the potential for biased and prejudiced testimony.

In short, this case is unlike *Baby Irons* where "virtually all of [the evidence] was uncontested." 235 Kan. at 553. We therefore conclude the district court is best equipped to make the determinations concerning voluntariness on remand, for as the *Baby Irons* court itself said at 235 Kan. 540, Syl. 10:

"Whether a consent to adoption was freely and voluntarily given or was tainted by undue influence necessarily depends on the facts and circumstances of each case. *As such, these issues are to be determined by the trier of fact who has the best opportunity to weigh the evidence and test the credibility of witnesses.*" (Emphasis added.)

Because of the judge's familiarity with this case's evidence, the parties, and the witnesses, we leave it to him on remand to determine what he needs so he can follow the instructions contained in this opinion. His consideration includes everything from his own simple review of the record to a full evidentiary hearing.

Issue 3: *Did the district court have jurisdiction to grant a decree of adoption?*

Before the Court of Appeals, Mother also argued that the district

court lacked jurisdiction to grant a decree of adoption. Mother framed the issue as one of statutory interpretation of K.S.A. 59-2113, which governs who may adopt. The statute provides: "Any adult, or husband and wife jointly, may adopt any minor or adult as their child in the manner provided in K.S.A. 59-2111 through 59-2143, except that one spouse cannot do so without the consent of the other." Mother asserted that the adoptive parents are prohibited from adopting because they are not married. The adoptive parents responded that substantial competent evidence supported the finding of the trial court that the adoptive parents were married by common law and that, therefore, statutory interpretation of K.S.A. 59-2113 is not required.

The Court of Appeals stated: "[W]e need not delve into an interpretation of that statute, given our reversal on the first issue. Likewise, the district court found that M.A. and E.M. had a common-law marriage and that finding was supported by the evidence. Thus, Mother's statutory argument is doubly moot." 36 Kan. App. 2d at 631-32.

This court discussed common-law marriage in *In re Estate of Antonopoulos*, 268 Kan. 178, 192-93, 993 P.2d 637 (1999):

"The essential elements of a common-law marriage are: (1) capacity of the parties to marry; (2) a present marriage agreement between the parties; and (3) a holding out of each other as husband and wife to the public. Although the marriage agreement need not be in any particular form, it is essential there be a present mutual consent to the marriage between the parties. The burden of proving a common-law or consensual marriage rests upon the party asserting it. [Citation omitted.] If the district court's findings are supported by substantial competent evidence and the court properly applied the rules in the aforementioned case, this court will affirm the district court. [Citation omitted.] Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. Stated in another way, substantial evidence is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. [Citation omitted.]"

Here, Mother challenged whether M.A. and E.M. met the requirement of a present marriage agreement. She quoted portions of M.A.'s testimony regarding the couple's desire to marry by the laws of the court and church: "We were going to get married when

my father died. And, we have not got [*sic*] married, not because we don't want to. We want to get married but we want to get married *for both laws, by the law and here in the Court, and by the law of the church.*" (Emphasis added.)

M.A.'s statement was taken out of context by Mother. Although M.A. did state that the couple had not married, it appears that she only meant they had not been married in a formal ceremony. Earlier in M.A.'s testimony she stated that she and E.M. lived together as common-law husband and wife and that they had lived together for 14 years. She believed that under Kansas law, they were married. Indeed, they called each other husband and wife.

As stated by the Court of Appeals, substantial competent evidence supports the district court's finding that M.A. and E.M. were common-law husband and wife. See *In re Marriage of Kopac*, 30 Kan. App. 2d 735, 47 P.3d 425 (2002). Therefore, pursuant to K.S.A. 59-2113, at least on this basis the district court had jurisdiction to grant a decree of adoption to them.

The judgment of the Court of Appeals is reversed. The judgment of the district court is affirmed in part, and the case is remanded for proceedings consistent with this opinion.

JOHNSON, J., not participating.
LOCKETT, J., Retired, assigned.

DAVIS, J., dissenting: In adopting K.S.A. 59-2114(a), the Kansas Legislature explicitly stated that the requisite consent from the natural parent (or parents) in adoption proceedings

"shall be in writing and *shall be acknowledged* before a judge of a court of record or before an officer authorized by law to take acknowledgments. If consent is acknowledged before a judge of a court of record, it shall be the duty of the court to advise the consenting person of the consequences of the consent. A consent is final when executed, unless the consenting party, prior to final decree of adoption, alleges and proves by clear and convincing evidence that the consent was not freely and voluntarily given. The burden of proving the consent was not freely

and voluntarily given shall rest with the consenting party." (Emphasis added.) K.S.A. 59-2114(a).

The majority opinion finds that the consent form in the current case was in substantial compliance with this statute, despite the mandatory language of the statute and despite the absolute lack of acknowledgment of the natural mother's consent in this case. Because I cannot agree with the majority's conclusion that the actions in this case substantially comply with the statute, I respectfully dissent.

This court has consistently explained with regard to courts' interpretation of statutes:

" 'It is a fundamental rule of statutory construction, to which all other rules are subordinate, that the intent of the legislature governs if that intent can be ascertained. The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted. When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be. Stated another way, when a statute is plain and unambiguous, the appellate courts will not speculate as to the legislative intent behind it and will not read such a statute so as to add something not readily found in it.' " *McIntosh v. Sedgwick County*, 282 Kan. 636, 642, 147 P.3d 869 (2006) (quoting *State ex rel. Stovall v. Meneley*, 271 Kan. 355, 378, 22 P.3d 124 [2001]).

See *In re Marriage of Killman*, 264 Kan. 33, 42-43, 955 P.2d 1228 (1998).

In his dissent in *In re Adoption of Trent*, 229 Kan. 224, 624 P.2d 433 (1981), Justice Fromme explained that in applying a substantial compliance standard where the statutes in question contained mandatory language like that used in K.S.A. 59-2114(a), "[t]he majority of this court have abandoned their judicial role of interpreting the law and have stepped into a legislative role of amending what heretofore were mandatory requirements of two different legislative enactments." 229 Kan. at 232 (Fromme, J., dissenting). The effect of this form of statutory interpretation, according to Justice Fromme, was to "repeal[] the statute by permitting a court to disregard the requirements of that statute. This is a legislative prerogative. Such a rule will create confusion and litigation over clear, concise and mandatory statutes." 229 Kan. at 233 (Fromme, J.,

dissenting). The facts in the instant case realize Justice Fromme's prediction.

Here, the natural mother did not sign the consent form in the presence of a judge, a notary public, or any other person authorized to take acknowledgments. Instead, she signed the form in the presence of several of the adoptive parents' family. When the adoptive parents learned from their attorney that the statute required that the natural mother's signature be acknowledged, the adoptive parents did not return to her with an appropriate public officer. Instead, *they went to a personal acquaintance who was authorized to take acknowledgments and told her "all that happened."* This personal acquaintance then "acknowledged" the natural mother's signature outside of her presence and having no personal knowledge of her. Not only was this a clear violation of the acknowledgment statutes, see K.S.A. 53-501 *et seq.*, but also, as the Court of Appeals found in this case, the acknowledgment was "in all material respects, false and untrue." *In re Adoption of X.J.A.*, 36 Kan. App. 2d 621, 630, 142 P.3d 327 (2006). Nevertheless, the majority finds that these actions "substantially complied" with the requirements of K.S.A. 59-2114(a), which states that consent "shall be acknowledged before a judge of a court of record or before an officer authorized by law to take acknowledgments."

This is not a "slight deviation," as even Justice Fromme characterized the actions of the notary public in *Trent*, where the public officer crossed the state line into the Missouri portion of the Kansas City metropolitan area to witness a signature. 229 Kan. at 233 (Fromme, J., dissenting). In this case, *no acknowledgment* was taken of the natural mother's signature, nor was any valid acknowledgment attempted. In other words, the specific requirements of K.S.A. 59-2114(a) were not followed. Instead, that statute was intentionally disregarded by both the adoptive parents and the notary public. The majority finds that despite the apparent disregard for the specific requirements of K.S.A. 59-2114(a), the consent in this case nevertheless *satisfies the statutory purpose.* I cannot agree.

Our case law has defined "substantial compliance" as " ' "compliance in respect to the essential matters necessary to assure every reasonable objective of the statute." ' " *Orr v. Heiman*, 270 Kan.

109, 113, 12 P.3d 387 (2000). K.S.A. 59-2114(a) states that the required consent for adoption proceedings "shall be in writing and shall be acknowledged before a judge of a court of record or before an officer authorized by law to take acknowledgments."

This court has previously explained that "[t]he purpose and necessity of a written consent is to insure that the natural parent freely and voluntarily consents to the adoption." *Trent*, 229 Kan. at 228. The majority relies upon this statement in its conclusion that the court's determination in this case that the natural mother's consent was freely and voluntarily given results in substantial compliance with the statute. Nevertheless, K.S.A. 59-2114(a) provides that the consent "shall be in writing *and* shall be acknowledged." (Emphasis added.) It may be that the purpose of the acknowledgment requirement is identical to that of the written consent—to ensure the voluntariness of the act. However, this court has held on numerous occasions that " '[t]here is a presumption that the legislature does not intend to enact useless or meaningless legislation.' " *Pieren-Abbott v. Kansas Dept. of Revenue*, 279 Kan. 83, 89, 106 P.3d 492 (2005). It can therefore be inferred from the fact that K.S.A. 59-2114 contains two specific requirements—that the consent be in writing and that it be acknowledged—that the acknowledgment requirement serves purposes in addition to those served by written consent alone.

This court considered a similar question in *City of Lenexa v. City of Olathe*, 233 Kan. 159, 660 P.2d 1368 (1983), which involved a determination of whether a municipality had substantially complied with the annexation statutes, K.S.A. 12-519 *et seq.* The municipality had followed all of the general procedural requirements of the statutes but had mistakenly publicized that it was to annex the wrong tract of land. 233 Kan. at 163-65. The *City of Lenexa* court held that the municipality had not substantially complied with the annexation statutes because the publication requirement served a different purpose from the general annexation procedures:

"The general purpose of the annexation statutes is to protect the rights of landowners against unilateral action by a city in annexing their land. [Citations omitted.] Because all the land involved here was land which the owners petitioned the

city to annex, this general objective has been served. If that were the only objective the publication requirement in K.S.A. 12-523 would be redundant. However, the publication requirement is there. It can be assumed the legislature intended publication to be of some importance and not merely a useless or meaningless act when it passed K.S.A. 12-523. [Citation omitted.]" 233 Kan. at 164.

In the same way, the legislature's specific inclusion of the acknowledgment requirement in K.S.A. 59-2114(a) indicates that the acknowledgment serves other purposes in addition to those served by the writing requirement. As the Colorado Supreme Court explained in a similar case:

"The evidence shows that the respondent [natural mother] signed the consent in the presence of petitioners [adoptive parents], and that it was not subscribed and sworn to as required by the statute. It is argued that in this case the evidence shows that there was no duress or fraud at the time respondent signed the consent, and that the purpose of having such a consent subscribed and sworn to is to lessen the possibility of duress or fraud. Admitting that this could be one purpose of that procedure, we still cannot say that the legislature did not intend that every consent by the natural parent to an adoption of a child should not be subscribed and sworn to *for the purpose of emphasizing the seriousness and solemnity of the step being taken.* It also should be emphasized that the person authorized by law to administer oaths or affirmations is a *public officer*, which of itself . . . *gives the transaction a more impressive setting and an atmosphere of finality.*" (Emphasis added.) *Foley v. Carnesi*, 123 Colo. 533, 537, 232 P.2d 186 (1951).

In this case, not only do the facts raise significant doubts regarding the voluntary nature of the natural mother's consent, but the total lack of acknowledgment fails to provide any of the other safeguards that the *Foley* court recognized as being provided by the acknowledgment requirement. According to the natural mother's testimony, she was asked to sign the consent form as she was exiting a vehicle. According to the adoptive parents' version of the events, the natural mother signed the consent form in the home of one of the adoptive parents' relatives. In any event, it is uncontroverted that no public officer was present to "give[] the transaction a more impressive setting and an atmosphere of finality." *Foley*, 123 Colo. at 537. Similarly, there is no indication that the environment in which the natural mother signed the consent form emphasized the "seriousness and solemnity of the step being taken"—namely, that she was signing away all parental rights re-

lating to her daughter. 123 Colo. at 537. Under such circumstances, it cannot be said that the natural mother's consent was given in " ' "compliance in respect to the essential matters necessary to assure every reasonable objective" ' " of K.S.A. 59-2114(a). *Orr*, 270 Kan. at 113.

Moreover, the case law cited by the majority provides no support for its conclusion that the parties in this case substantially complied with the statute. In *Trent*, the court was faced with a question of whether a Kansas notary public's acknowledgment of a signature in Missouri voided the consent for purposes of the adoption statutes. In that case, the only discrepancy from the statutory requirements was one of venue. The natural mother signed her consent voluntarily in the presence of the notary public, which the notary acknowledged. 229 Kan. at 226. Thus, the consent was provided in accordance with all of the solemnities and seriousness of signing in the presence of a public officer. *Trent* presents a markedly different scenario than the one here, where no public officer was present to acknowledge the natural mother's signing of the consent forms.

Similarly, the decision in *In re Adoption of J.H.G.*, 254 Kan. 780, 869 P.2d 640 (1994), does not support the majority's finding of substantial compliance in this case. In *J.H.G.*, the adoptive parents failed to include certain information in the petition for adoption; however, the majority of this information was included in other paperwork filed with the petition. The required accounting, which was not filed with the petition, was filed with the district court before it entered its final decree of adoption. While information regarding the Uniform Child Custody Jurisdiction Act (UCCJA), the Interstate Compact on the Placement of Children, and the Indian Child Welfare Act (ICWA) were never provided, it was undisputed that these acts did not apply. Thus, all of the required information was before the district court when it made its decision. 254 Kan. at 793-97.

Other than by its application of substantial compliance, the decision in *J.H.G.* has little to do with the current facts. There was no question in *J.H.G.* that the natural mother's consent was given in the presence of a notary who was authorized to take acknowl-

edgments. 254 Kan. at 786-87. Moreover, given the fact that the natural mother failed to contest the voluntariness of her consent before the final adoption decree was entered, the mother was barred from raising such a request on appeal. 254 Kan. at 791-93. The issue of consent, which the court in *J.H.G.* recognized as " 'an essential requisite to jurisdiction on the part of the court to render a valid decree of adoption,' " was not a factor in that case. 254 Kan. at 791 (quoting *In re Adoption of Trent*, 229 Kan. at 228).

The two out-of-state cases cited by the majority are also distinguishable. In *In re Adoption of Infant Child Baxter*, 799 N.E.2d 1057 (2003), *reh. denied* (2004), the Indiana Supreme Court held that a consent given outside the presence of a public officer could be proved by extrinsic evidence. The applicable consent statute in that case stated: " 'The consent to adoption may be executed at any time after the birth of the child either in the presence of [any one of six specified entities].' " *Baxter*, 799 N.E.2d at 1062 (quoting Ind. Code § 31-19-9-2). Considering this language, the court found that "the intent of the statute, which is designed to provide an equitable adoption procedure by protecting the rights of the adoptive parents and the child as well as those of the biological parents, is best served by finding the consent voidable." *Baxter*, 799 N.E.2d at 1061 (citing *In re Adoption of H.M.G.*, 606 N.E.2d 874, 874 [Ind. App. 1993]). The *Baxter* court continued:

"[I]f the written consent is not executed in the presence of any one of the six specified entities, the validity of the consent may nevertheless be satisfied by evidence that the signatures are authentic and genuine in all respects and manifest a present intention to give the child up for adoption." 799 N.E.2d at 1062.

Noticeably absent from the *Baxter* court's analysis of the Indiana consent statute is any discussion of whether the given consent had substantially complied with the statute. Instead, the court considered how "the intent of the statute" would be "best served." This is not the analysis undertaken by Kansas courts, which proceed under the assumption that the legislature " 'expressed its intent through the language of the statutory scheme it enacted' " and which " 'must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not

be.' " *McIntosh*, 282 Kan. at 642 (quoting *Meneley*, 271 Kan. at 378). See *In re Marriage of Killman*, 264 Kan. at 42-43. Furthermore, the *Baxter* court, like the majority here, fails to consider whether the legislature intended the acknowledgment requirement to serve purposes in addition to providing "an equitable adoption procedure." *Baxter*, 799 N.E.2d at 1061 (citing *H.M.G.*, 606 N.E.2d at 874).

The analysis of the Montana Supreme Court in *Riley v. Byrne*, 145 Mont. 138, 399 P.2d 980 (1965), also is irreconcilable with Kansas' substantial compliance standard. While the natural parents' consents in that case were not acknowledged by a public officer, the *Riley* court focused its analysis on "whether appellants' [natural parents'] consents were obtained voluntarily." 145 Mont. at 144. The court found that "[t]o deny the validity of a decree of adoption for lack of acknowledgement [*sic*] when the natural parents have fully exercised those rights which such acknowledgement [*sic*] was designed to protect would, we think, reach a result contrary to the spirit of our adoption statutes." 145 Mont. at 145.

The opinion of the Montana court should not govern this court's decision for two notable reasons. First, as I have pointed out previously, the purpose of the acknowledgment requirement in K.S.A. 59-2114(a) is not limited, as both the majority and the Montana court assume, to a prima facie showing of voluntariness. See slip op. at 22-24; *Riley*, 145 Mont. at 144. Rather, this requirement serves a number of other functions, such as emphasizing the seriousness of the consent and providing the presence of a public officer. These purposes are not served by ignoring the statutory requirement.

Second, like the *Baxter* opinion from Indiana, the *Riley* court makes no reference whatsoever to substantial compliance. Instead, *Riley* is motivated entirely by "the spirit of [Montana's] adoption statutes." 145 Mont. at 145. Nowhere does *Riley* cite to the applicable statute or provide the governing statutory language regarding the acknowledgment requirement in that state. In Kansas, the substantial compliance inquiry does not allow a court to disregard the language of the statute being interpreted. See *City of Lenexa*, 233 Kan. at 164. Our inquiry is motivated not by a detached consid-

eration of the "spirit" of a particular statute, but rather by a consideration of whether there has been " ' "compliance in respect to the essential matters necessary to assure every reasonable objective of the statute." ' "' *Orr*, 270 Kan. at 113.

In addition to its failure to consider the applicability of the reasoning from the *Baxter* and *Riley* decisions to Kansas' substantial compliance analysis, the majority's conclusion in the present case does not reconcile its analysis with other persuasive authority relied upon by the *Trent* court. In particular, *Trent* cited a Colorado decision, *Foley v. Carnesi*, 123 Colo. 533, 232 P.2d 186 (1951). In *Foley*, the natural mother had signed a "relinquishment of rights and consent to adoption," as well as a letter stating: " 'I do hereby agree to the adoption of [the child] by [the adoptive parents].' " 123 Colo. at 534. The forms and statement were signed in the home of the adoptive parents and had not been acknowledged by a notary public, as was required by the statute. Because the consent did not comply with the statutory requirements, the district court vacated the decree of adoption.

The Colorado Supreme Court affirmed, finding that "[t]he point in this case is not whether the natural mother can now withdraw her consent, but whether her consent in the adoption proceedings of her child was 'the requisite consent,' in compliance with the statute." 123 Colo. at 536. The court held that "this statutory, procedural step [requiring acknowledgment] could not be ignored." 123 Colo. at 537. The court also found that the natural mother's due process rights had been violated because, as a minor, she could not waive service of process requirements. 123 Colo. at 537-38.

The *Trent* court recognized that the reasons for putting aside the adoption in *Foley*—the faulty consent and the lack of notice— were *"equally valid."* 229 Kan. at 229. Thus, this court recognized that the failure to sign a consent to adoption in the presence of a notary public or other public officer was a violation of the *statute* that supported the district court's decision to vacate the adoption decree. In distinguishing *Foley* from the facts in *Trent*, this court emphasized that "[t]he letter of consent [in *Foley*] had not been acknowledged by a notary public and *there had been no attempt to obtain any manner of official acknowledgment."* 229 Kan. at 229.

In *Trent*, however, the natural mother's consent was given in the presence of a public officer, although it was given in Missouri instead of Kansas. Nevertheless, by citing *Foley*, the *Trent* court implicitly recognized that there are some cases where actions will not substantially comply with the acknowledgment requirements—namely, where the consent is not signed in the presence of an officer authorized to take acknowledgments.

On a practical level, a review of the record in this case demonstrates that no effort was made to comply with the statutory requirements of K.S.A. 59-2114(a). Instead, when the adoptive parents were made aware of the statutory requirements, they sought out an acquaintance who also served as a notary public and told her "all that happened"; the notary then falsely acknowledged the natural mother's signature. In short, not only was there no effort made to comply with the statutory requirements, but there also was a conscious disregard by the adoptive parents for those requirements and the purposes served by them. In such circumstances, one cannot say that the consent form substantially complied with the requirements of K.S.A. 59-2114(a).

The majority concludes, in my opinion erroneously, that the purpose of the acknowledgment requirement is to provide " '*prima facie proof* of the . . . validity of the consent, . . . [of] the identity of the signer[,] . . . [and] that the written consent was freely and voluntarily given.' " Slip op. at 22 (citing *Trent*, 229 Kan. at 228). The majority finds that in the absence of an acknowledgment at the time of signing, substantial compliance is nevertheless provided by holding an evidentiary hearing to determine whether these purposes were met. The majority seeks to avoid the constitutional implications of such a hearing discussed by the Court of Appeals below, see 36 Kan. App. 2d at 628-31, by transferring the burden of proof at the hearing regarding the voluntariness of the consent from the natural mother to the adoptive parents. See slip op. at 22-24.

There are several problems with the majority's conclusion that an evidentiary hearing on the question of voluntariness may lead to substantial compliance with K.S.A. 59-2114(a). First, the majority's conclusion runs contrary to the clear language of the statute,

which explicitly provides that when a natural parent is contesting the consent during an adoption proceeding, that parent must "allege[] and prove[] by clear and convincing evidence that the consent was not freely and voluntarily given." The statute further provides that "[t]he burden of proving the consent was not freely and voluntarily given shall rest with the consenting party." K.S.A. 59-2114(a). The burden shifting described by the majority is directly contrary to the plain statutory language.

In addition, the majority's solution cannot reconcile itself with the wording of the acknowledgment requirement itself, which provides that consent "shall be in writing and *shall be acknowledged*" before a public officer authorized to take acknowledgments. (Emphasis added.) K.S.A. 59-2114(a). However, the majority decision in this case effectively does away with the need for an acknowledgment as long as the court holds an after-the-fact hearing to determine whether the consent was voluntary. The majority's substantial compliance reasoning, therefore, may be summarized as follows: Despite the mandatory language in K.S.A. 59-2114(a), the statute's acknowledgment requirement may be disregarded as long as an evidentiary hearing is held to determine whether the consent was voluntary. The burden of proof at this hearing will be on the adoptive parents, despite the statute's clear statement that "[t]he burden of proving the consent was not freely and voluntarily given shall rest with the consenting party." K.S.A. 59-2114(a). In my opinion, this analysis cannot constitute "substantial compliance" with the statute, as it specifically runs contrary to two clear mandates therein.

Finally, the majority's evidentiary hearing solution fails to further the other purposes served by the acknowledgment requirement. An evidentiary hearing cannot retroactively provide the solemnity of the acknowledgment at the original signing of the consent that the legislature deemed appropriate. Similarly, the environment of the hearing cannot provide the appropriate seal of finality associated with signing the consent in the presence of a public officer. While the hearing does provide a public presence, the very nature of such a hearing indicates that the natural parent is contesting the consent at such a forum—not providing consent willingly. There-

fore, the evidentiary hearing envisioned by the majority cannot constitute " ' "compliance in respect to the essential matters necessary to assure every reasonable objective of the statute." ' " *Orr*, 270 Kan. at 113.

In light of the several purposes to be served by the acknowledgment requirement in K.S.A. 59-2114(a) and the case law, the five points put forth by the majority of this court in support of its opinion are either unfounded or inapplicable. First, the majority finds that *Trent* stands for the proposition that "a failed attempt at acknowledgment did not preclude substantial compliance with the acknowledgment requirement." Slip op. at 17. However, the current facts do not demonstrate "a failed attempt at acknowledgment." Instead, the facts illustrate that the adoptive parents, after being informed of the acknowledgment requirement, attempted to circumvent that requirement by going to an acquaintance and asking her to "acknowledge" the natural mother's signature in violation of the notary statutes. As I have previously explained, this behavior is not substantial compliance, or even compliance at all—this is knowing disregard of a statutory requirement.

The remainder of the five points assume that the facts in this case support a finding of substantial compliance. In its second point, the majority explains that "in *Trent* we held that a consent to adoption executed in substantial compliance with statutory requirements is valid under a consent statute in view of subsequent judicial proceedings." Slip op. at 17. However, the consent in this case was *not* executed in substantial compliance with the statute, and a hearing on the subject of consent cannot cure the failure to follow the statutory procedure or provide substantial compliance with that statutory procedure.

Third, the majority finds that the mandatory language of K.S.A. 59-2114(a) (namely, the term "shall") may be interpreted as allowing for substantial, not only strict, compliance with its requirements. Nevertheless, the majority's interpretation of K.S.A. 59-2114(a) requires at least *substantial* compliance with the statute; such compliance is not evidenced here.

Fourth, the majority finds that the failure to comply with the mandatory requirements of K.S.A. 59-2114(a) "can be cured with

information from other sources, so long as the statutory purpose is met." Slip op. at 18. However, there are numerous purposes served by the acknowledgment requirement, including an indication that the consent was freely and voluntarily signed, as well as the symbol and ceremony provided by a public officer to emphasize the gravity of the proceedings. Even if one were to argue that the consent was signed voluntarily, a conclusion cast into serious doubt by the evidence in this case, the other purposes of this statutory requirement were not met. An after-the-fact hearing cannot cure a complete failure to comply with the procedural requirements of K.S.A. 59-2114(a).

Fifth, the majority states that "the determination of substantial compliance with a statutory requirement is a finding of fact by the district court which will not be disturbed on appeal if supported by substantial competent evidence." Slip op. at 18. Even considering the deference given to district courts in making such determinations, there can be no question that the adoptive parents failed to comply with the statutory requirements. K.S.A. 59-2114(a) states that a consent to adoption "shall be in writing and shall be acknowledged before a judge of a court of record or before an officer authorized by law to take acknowledgments." Here, it is uncontroverted that the natural mother did not sign the consent in the presence of a notary public or other official authorized to give acknowledgments. There is simply no evidence to support the district court's finding in this case that the purported acknowledgment substantially complied with the statutory requirements.

I recognize that my reasoning in this case would lead to the regrettable result of removing this child from the care of her adoptive parents, with whom she has lived her entire 2½ years. However, as the Court of Appeals noted below, "[a]n appellate court should refrain from rewriting a plainly worded statute simply to reach a desired result. Result-oriented justice is directly contrary to the concept of the rule of law." *X.J.A.*, 36 Kan. App. 2d 621, Syl. ¶ 7. Moreover, the adoptive parents could have avoided this result by simply complying with the statutory acknowledgment requirement after their attorney explained it to them. The majority's opinion in this case—and the district court's opinion below—leads to

the regrettable result of having a natural mother's daughter removed from her care without satisfying the important safeguards established by the legislature that she voluntarily consents to the relinquishment of her parental rights and understands the seriousness of her actions.

In my opinion, the majority decision has the result of increasing litigation on the issue of consent in adoption cases, which is a result the legislature sought to eliminate by enacting K.S.A. 59-2114(a). In holding that the consent in this case substantially complied with the requirements of K.S.A. 59-2114(a), the majority effectively nullifies the explicit statutory requirement that a consent to adoption be acknowledged by a public officer and replaces it with an evidentiary hearing. As Justice Fromme noted in his dissent in *Trent*, this is a "legislative prerogative," runs contrary to the plain language of the statute, and undermines the purposes the requirement was meant to serve. 229 Kan. at 233 (Fromme, J., dissenting). I would affirm the opinion of the Court of Appeals reversing the district court.

ROSEN, J., joins in the foregoing dissenting opinion.