No. 120,797

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of
the Adoption of E.D.

SYLLABUS BY THE COURT

1.

In a private adoption in which the proposed adopting party seeks to terminate the parental rights of the parent, the proposed adopting party may bring the action either by filing separate actions to terminate parental rights and for adoption or by filing both claims in a single petition. If the claims are filed together and a consent to the adoption is not filed at the same time as the petition as required by K.S.A. 2018 Supp. 59-2128(f), that has no effect on the court's subject-matter jurisdiction over the claim to terminate parental rights.

2.

The district court's finding in this case that the child's mother failed to assume parental duties for a two-year period was supported by clear and convincing evidence, so the district court's order terminating the mother's parental rights was proper.

Appeal from Johnson District Court; MICHAEL P. JOYCE, judge. Opinion filed November 22, 2019. Affirmed.

*Richard P. Klein*, of Olathe, for appellant mother.

*Kevin W. Kenney*, of Kevin W. Kenney, P.A., of Prairie Village, for appellees adoptive parents.

Before HILL, P.J., LEBEN, J., and WALKER, S.J.

LEBEN, J.: A.D. (Mother) appeals the termination of her right to parent E.D., her adoptive son. She first argues that the district court didn't have jurisdiction to consider the termination of her parental rights because the petition seeking termination was combined with a claim by the child's legal guardians to adopt him—and a consent form that the adoption statute says "shall be filed with the petition for adoption" wasn't filed with it. But the issue before us about Mother is whether her parental rights should be terminated; her challenge does not affect the district court's ability to decide that question. We find no jurisdictional problem with the district court's consideration of the termination of Mother's parental rights.

Thus the real issue before us is whether the district court properly terminated those rights, and she also challenges that ruling. A statute, K.S.A. 2018 Supp. 59-2136(h)(1)(G), provides for termination when a parent has failed to assume or fulfill the duties of a parent for the two years before filing of the petition to terminate parental rights. During that time, E.D. went from 12 to 14 years old, and he was living with his legal guardians. But with a child at that age, who can communicate in many ways, even a parent who lived apart from the child could have an active relationship with him. But Mother didn't initiate contacts, didn't check on E.D.'s work in school, and didn't help E.D.'s legal guardians to get E.D.'s immigration status fixed. Clear and convincing evidence supported the district court's conclusion that Mother's parental rights should be terminated because she had failed to assume parental duties for the two-year period. We therefore affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Mother has for many years done work at an orphanage in Zambia. She met E.D., then five years old, at the orphanage in 2009. E.D. was HIV positive, so Mother arranged a six-month visa for E.D. to come to the United States for medical treatment. That visa could be renewed for six more months for a total of one year, and Mother did that.

2

Mother adopted E.D. in 2011. By that time, the visa had expired.

In 2012, she approached a couple she knew from church, Susana and Tim, and asked if E.D. could live with them. E.D. had already stayed with Susana and Tim for some extended periods of time because of Mother's travel. After some consideration and discussion, Susana and Tim agreed, and with Mother's consent they became court-approved legal guardians for E.D.

Mother often visited E.D. until November 2014. Around Thanksgiving, Mother sent a series of suicidal text messages to Susana. That led Susana and Tim to limit Mother's contacts with E.D.—and then to Mother moving in court to terminate the guardianship.

The court denied Mother's motion and entered a formal guardianship plan in July 2015. At that time, E.D. was 11. The plan provided that Mother could have at least one weekly visit with E.D. but that the visits be supervised. Mother was to schedule the visits with a supervisor, and Susana and Tim would pay for any expense of the supervision. The court directed that Mother, Susana, and Tim cooperate in scheduling the visits.

Between July and December 2015, Mother visited E.D. twice. For the first visit, Susana and Tom arranged for the supervisor. For the second, Susana served as the supervisor. After that, Mother didn't see E.D. again until July 2016 when, by agreement, she had an unsupervised visit. After that, Mother had several more unsupervised visits lasting from one to four hours.

That arrangement ended around Labor Day in 2016. A two-hour unsupervised visit had been planned for a Saturday morning. But Mother called Susana the night before and said she planned to pick E.D. up in the morning, take him out of town, and not bring him

back until late that night. Susana didn't agree to that, and no visit took place. That Saturday, after the visitation plan fell through, Mother sent about 30 text messages to Susana, leading Susana to block Mother from further cell-phone contact. In addition, Susana and Tim decided to resume enforcing the supervision requirement for future visitation.

From that point forward, Mother didn't initiate any visits. She testified that she couldn't find an unbiased supervisor and that the plan required that Susana and Tim approve of any supervisor she might select.

In October 2017, about a year after the visits stopped, Susana and E.D. saw Mother at church. Susana gave Mother a ride to where she was living, and Mother asked to see them the next week to discuss a plan to get a Social Security number for E.D. They met again the following Sunday at church.

In mid-January 2018, Mother sent a message to Susana by social media asking that E.D. attend a Martin Luther King, Jr. Day luncheon with her. Susana didn't see that request, though, until well after the event.

During the time the guardianship plan was in effect, Mother didn't ask Susana and Tim for information about E.D. Nor did she attend any of E.D.'s medical appointments or any functions at E.D.'s school. Mother provided some school supplies worth about $40 one time, and she sent birthday gifts of a shirt and cologne to E.D.

Beyond these basic facts about where E.D. lived and what Mother's interactions with him were, we must also discuss E.D.'s immigration status. His visa expired in 2011, leaving him with no legal document that authorizes his continued presence in the United States. He is thus one of the millions of undocumented people living in the United States, people who came here legally but no longer have authorization to remain. His

4

undocumented status prevents him from obtaining a Social Security number, a driver's license, or many public benefits, like Medicaid.

An immigration attorney, Kathleen Irish, testified that an undocumented immigrant is at risk of removal from the country unless his immigration status is "adjusted." She said that there were three ways to do that: (1) for Mother to apply for permanent residency; (2) for Susana and Tim, as legal guardians, to apply for "Special Immigrant Juvenile Status"; or (3) for Susana and Tim to adopt the child and apply for permanent residency. For each option, an attorney could help find and complete the proper forms.

Irish testified that Mother could have filed for permanent residency for E.D. after she adopted him. Susana and Tim asked Mother for help with E.D.'s immigration status several times over the years. At one point, after disagreements about her visitations with E.D. arose, Mother said that she had a plan to work out the immigration issues but needed physical custody of E.D. for two weeks to do it. Susana and Tim didn't agree to that.

The testimony we've referred to came in a trial on claims Susana and Tim brought. They filed a petition in August 2018 making two claims: (1) that the court should terminate Mother's parental rights to E.D. based on a claim that she had failed to assume the responsibilities of a parent for two years and (2) that after terminating Mother's parental rights, the court allow Susana and Tim to adopt E.D. The court heard evidence from both sides and ruled for Susana and Tim on both claims.

Mother has appealed the termination of her parental rights to our court.

ANALYSIS

Mother makes two arguments on appeal. First, she contends that the district court lacked subject-matter jurisdiction over the case based on a filing mistake made by Susana and Tim (or their attorney). Second, if we find that the district court had jurisdiction, she contends that the evidence wasn't sufficient to terminate her parental rights.

I. *Mother Has Not Shown That the District Court Lacked Jurisdiction Over the Termination of Her Parental Rights.*

We'll start with the jurisdiction issue. Mother challenges the court's subject-matter jurisdiction—its authority to hear the case. Since adoptions weren't recognized in common law, a court's subject-matter jurisdiction over an adoption case must come from a statute. *In re Adoption of H.C.H.*, 297 Kan. 819, 825, 304 P.3d 1271 (2013). To understand Mother's argument, we must first explain some procedures our statutes set out for handling adoption cases.

Adoptions are provided for under the Kansas Adoption and Relinquishment Act, found at K.S.A. 59-2111 to 59-2144. The Act provides for several types of adoption.

In what's called an agency adoption, the child is placed with an agency, and the agency has the authority to consent to the adoption. In a stepparent adoption, the spouse of one of the child's parents seeks to adopt. In our case, the child's legal guardians brought the adoption proceeding under provisions for an "independent adoption." In an independent adoption, the child's parent or legal guardian brings the action. See K.S.A. 2018 Supp. 59-2112(b), (c), and (d). And if the legal guardian brings the action, there's a need either for the parent's consent or a court finding that consent isn't needed. See K.S.A. 2018 Supp. 59-2129(a).

6

Susana and Tim sought a court finding that Mother's consent wasn't needed. That can be done through an action to terminate Mother's parental rights under one of several circumstances provided by statute. For Susana and Tim to adopt E.D. would be a two-step process. First the court would have to terminate Mother's parental rights, which would make her consent unnecessary. At that point, Susana and Tim, as legal guardians, could consent to their own adoption of E.D., subject to court approval.

Most court actions begin with what's called a petition, and that's true in both adoption proceedings and in proceedings to terminate parental rights. A statute provides that both of the steps Susana and Tim would need to take—(1) seeking termination of Mother's parental rights and (2) adopting E.D.—can either be filed in a single petition or filed separately. That statute, K.S.A. 2018 Supp. 59-2136(d)(1), provides: "A petition to terminate parental rights may be filed as part of a petition for adoption or as an independent action."

Susana and Tim chose to file a single petition. It contained two claims, called counts. The first, Count One, sought to terminate Mother's parental rights. The second, Count Two, sought court approval for Susana and Tim to adopt E.D.

That these claims could have been filed separately is significant because Mother's claim of a jurisdictional problem relates only to Count Two. But Count One could have been brought by itself; Count One was the basis for the termination of Mother's parental rights; and Mother hasn't alleged any jurisdictional problem about Count One.

Also of significance is what's at issue in this appeal. The only issue before us is whether the district court's termination of Mother's parental rights was proper. An appellate court only obtains jurisdiction over the rulings identified in the notice of appeal. *Associated Wholesale Grocers, Inc. v. Americold Corporation*, 293 Kan. 633, 637, 270

7

P.3d 1074 (2011). Mother's Notice of Appeal here said "she appeals the decision of the Court finding her unfit and terminating her parental rights."

So the only matter properly before us in this appeal is what we've called the first step of the process, set out in Count One. Because Count One could proceed independently and we find no jurisdictional problem related to it, we conclude that the district court had proper subject-matter jurisdiction to hear Susana and Tim's claim that Mother's parental rights should be terminated.

What happened in the second step of the process—approval of the adoption of E.D. by Susana and Tim—isn't properly before us in this appeal.

Even if it were, we question whether there would be a subject-matter jurisdiction problem. Mother relied on our court's decision in *In re Adoption of I.H.H.-L.*, 45 Kan. App. 2d 684, 251 P.3d 651 (2011), and K.S.A. 2018 Supp. 59-2128(f), which provides that "[t]he written consents to adoption . . . shall be filed with the petition for adoption." Susana and Tim filed consents with the court the day after filing the petition for adoption, and they didn't have court authorization to consent to the adoption until after the court terminated Mother's parental rights. Mother argues that since K.S.A. 2018 Supp. 59-2128(f) says that the consents "shall" be filed with the petition, the district court's authority to hear the case is missing whenever the consents are missing when the petition is filed.

*I.H.H.-L.* differs in one respect from our case. In it, the parties seeking to adopt weren't the legal guardians for the child at the time of filing the petition, so there was "no consent from any statutorily authorized person." 45 Kan. App. 2d at 693. Mother rightly notes, though, that our court said that since consents "shall be filed" with the petition under the statute, "the district court did not have jurisdiction over the petition for adoption and should have dismissed the case." 45 Kan. App. 2d at 693-94.

But we're not sure that *I.H.H.-L.* is correctly decided. It failed to discuss a Kansas Supreme Court case, *In re Adoption of J.H.G.*, 254 Kan. 780, 869 P.2d 640 (1994), that interpreted the same statutory provision and required only substantial compliance.

In *J.H.G.*, the parties seeking to adopt the child failed to file something else that the statute required to be filed—an accounting of all expenses the proposed adoptive parents had paid, including ones to the birth mother who had signed a consent to the adoption. K.S.A. 2018 Supp. 59-2128(f) then and now said that the written consents *and* the accounting "shall be filed with the petition for adoption." So if the failure to file the consent with the adoption is jurisdictional, failure to file the accounting with the adoption would be jurisdictional too.

But our Supreme Court held that it wasn't. The court applied a substantial-compliance doctrine to the statute and found no jurisdictional problem even though the accounting wasn't filed until the same time the decree of adoption was filed. *J.H.G.*, 254 Kan. at 795-98; see also *In re Adoption of X.J.A.*, 284 Kan. 853, 863, 166 P.3d 396 (2007) ("[T]his court has not required strict compliance with adoption statutes but has followed the doctrine of substantial compliance.").

Susana and Tim filed the consent forms a day after filing the petition for adoption. And court approval for them to consent was given before the adoption was approved. That seems within the substantial-compliance rule applied in *J.H.G.* We need not decide that issue, though, because only the termination of Mother's parental rights is properly before us in this appeal. The district court had subject-matter jurisdiction over that issue.

9

II. *The District Court's Finding That Mother Failed to Assume the Duties of a Parent for Two Consecutive Years Is Supported by Clear and Convincing Evidence*.

Mother's other argument on appeal is that the evidence didn't support the district court's decision to terminate her parental rights. The district court found that Susana and Tim had shown that Mother had failed or refused to assume the duties of a parent for the two years before the filing of the petition. That's one of the bases provided by statute for terminating parental rights. See K.S.A. 2018 Supp. 59-2136(h)(1)(G). We review the evidence to see whether it met the required standard of clear and convincing evidence, meaning that the evidence establishes that the truth of the facts supporting the court's finding is highly probable. See K.S.A. 2018 Supp. 59-2136(h)(1); *In re Adoption of B.B.M.*, 290 Kan. 236, Syl. ¶ 3, 224 P.3d 1168 (2010). Because the district court, which acts as the fact-finder, ruled for Susana and Tim, we review the evidence in the light most favorable to them. *B.B.M.*, 290 Kan. 236, Syl. ¶ 3.

The district court considered three ways in which Mother might have carried out parental duties—financial support, contact with E.D., and helping fix E.D.'s immigration status. The court made no consideration of financial support because there had been no expectation, given Susana and Tim's resources as guardians, that Mother would contribute financially. But the court found that Mother had failed to assume parental duties in the other two areas.

As to visitation, the district court found that Mother made only incidental efforts to visit, contact, or communicate with E.D. K.S.A. 2018 Supp. 59-2136(h)(2)(B) provides that the court "may disregard incidental visitations, contacts, [and] communications," and the court did so. We agree with the court that the limited contacts Mother made during the two-year period were so sporadic that they could be disregarded as incidental under the statute. The district court also found that Mother's testimony that Susana and Tim

wouldn't approve visitation supervisors wasn't accurate and that Mother knew how to get court involvement if there had been problems.

As to E.D.'s immigration status, the district court noted that a parent's duties for someone like E.D., who came to the country on a medical visa, "include making sure her child becomes, [at] a minimum, a person legally able to remain in the United States and not subject to deportation [or] removal." Mother testified that she had spoken to immigration attorneys but didn't show that she had done anything to resolve E.D.'s immigration status. In the context of this case, resolving E.D.'s immigration status was one of the most important duties E.D.'s parent and guardians faced. Yet Mother did nothing constructive on the issue during (or before) the two-year period.

This case is a bit unusual since E.D. was properly cared for through a guardianship that Mother had helped establish. In this circumstance, the district court rightly declined to consider any lack of financial support by Mother. But the district court's conclusion that Mother failed to assume the duties of a parent through contact with E.D. and resolving E.D.'s immigration status is supported by clear and convincing evidence.

We note that Mother deserves credit for making E.D.'s life a better one. Through Mother's efforts, E.D. has received needed medical care and gained life possibilities that would not have been possible had Mother not opened her heart and home to him. We do not mean to diminish those real accomplishments here. But our role here is to determine whether clear and convincing evidence supported the district court's conclusion that she failed to assume her parental duties during the two-year period preceding the filing of the petition to terminate her parental rights. We have reviewed the evidence and conclude that clear and convincing evidence supported that conclusion.

We therefore affirm the district court's judgment.

11